Hamlin, Sandra L., J.
On January 27, 2005, a Middlesex jury found the defendant, Eric Murray (“Murray”) guilty of first degree murder on the grounds of deliberately premeditated malice aforethought, G.L.c. 265, §1, and possession of a firearm, G.L.c. 269, § 10(a). This court (Hamlin, J.) sentenced Murray to life without parole on the murder conviction, and to one year and a day on the firearm conviction, with the latter sentence running concurrently with the former. Murray argues that he is entitled to a new trial because the Commonwealth failed to disclose to Murray exculpatory gang-related information known to the Fra-mingham police at the time of trial. He asserts prosecutorial misconduct and seeks retroactive application of the common-law rule of evidence set forth in Commonwealth v. Adjutant, 443 Mass. 649 (2003). He also argues the court erred in denying his motion to suppress (Brassard, J.) and in denying certain jury instruction requests (Hamlin, J.).
Although it is unlikely that the Commonwealth was aware of the exculpatory evidence on which Murray bases his new-trial request, the evidence was known to the police participating in Murray’s case. As a result, Murray had a due process right to its disclosure. On this basis only, Murray’s motion for new trial is ALLOWED.
BACKGROUND
The facts, as presented at trial, are as follows.
Murray shot Joseph McDaniel (“victim”) on the night of October 7, 2003, in Framingham, Massachusetts. Eyewitnesses to the shooting who testified at Murray’s trial were Jerome Jones (“Jones”), Randy Lopez (“Lopez”),[1] Hector Perez (“Perez”), Anthony Campbell (“Campbell”), Richard Jamal Waters (“Waters”), and Dammond Bonner (“Bonner”).
During the day on October 7, the victim went to Boston with Waters and Paul Pervis (“Pervis”); while there, the victim made some purchases at a jewelry store. They met up with Jones, who drove with them back to Framingham. They dropped off Waters at his house in Framingham, then Jones, Pervis, and the victim went to the Beaver Park apartment complex (“Beaver Park”) in Framingham and hung out outside.
Murray and Lopez, along with a pit bull, also went to Beaver Park around that same time. Jones testified that Murray and the victim began “messing around” but he was not certain if the two men were serious or just joking, Transcript, Vol. IV, at 85, 86; he later testified that they were arguing about “somebody’s wanting to rob [Murray].” Transcript, Vol. IV,[2] at 123. Lopez testified that Murray asked the victim if the victim and KST were going to rob Murray; the victim did not respond, “[a]nd then they started like kind of arguing and yelling.” Transcript, Vol. VI, at 105. There was physical contact between Murray and the victim,[3] and the pit bull began barking and growling. The victim left in a car, then Jones, Lopez, Pervis, and Murray smoked marijuana together.
Campbell was in his car with his cousin James Salvi (“Salvi”) when Salvi received a call on his cell phone from the victim asking to be picked up in Framingham. Around eight that evening, they picked up the victim as well as Waters. They drove to Kendall Street where they parked the car in a parking lot and joined some people they knew at a common gathering place on the street in front of a house located at 116 Kendall Street. Those present included Franklin Porter (“Porter”) and Emmanuel Osamwonyi (“Osamwonyi”). Bonner and his girlfriend, Diana Paul (“Paul”), were also already at Kendall Street, and Salvi left with them to run an errand.
Meanwhile, Murray drove himself, Jones, Lopez, and Pervis to Kendall Street. On the way there, according to Jones, Murray stopped his car to speak to someone in another car, and Murray learned that the victim was looking for him; he stopped his car a second time to purchase drugs. Once they parked on Kendall Street, at approximately 9:00 p.m., Murray, Jones, Lopez, and Pervis walked down the street. By the time they arrived, there were at least five people already congregating in the area around 116 Kendall Street.
The victim was walking down Kendall Street to purchase cigarettes at a nearby store when Campbell heard someone say “something like there they are or here they come,” then Murray walked towards the victim with Lopez behind him. Transcript, Vol. IV, at 166. Once the victim and Murray were facing each other in the street, the victim made a movement with his arms.[4] Jones heard the victim say, “Let’s have a one-on-one or something”!;] Transcript, Vol. IV, at 143; Lopez heard one of the people behind the victim say, “You trying to bring it to my man? You wanna get popped?” Transcript, Vol. VI, at 168. Murray pulled out a gun from his hoodie, shot the victim,[5] then he and Lopez ran to their car, in the direction from which they had come. Perez observed Murray put something in his trunk before Murray and Lopez drove away; Lopez testified that the trunk opened, but he did not see Murray place anything inside, and Murray had the gun in the front seat with them as they drove away.
Upon being shot, the victim fell to the ground, and Campbell and Waters ran to him. Bonner, Paul, and Salvi returned to Kendall Street, stopping the car when *369 Porter flagged them down. A group, including Salvi, Waters, and Bonner, helped Campbell put the victim in the passenger seat of Campbell’s car. They drove to the hospital, with Bonner and Paul in a separate car in front of them. The police chased them, and stopped them once both cars reached the hospital. The victim, who sustained three gunshot wounds,[6] was declared dead at the hospital.
After leaving Kendall Street, Murray drove himself and Lopez to Rhode Island where they spent the night. While in Rhode Island, they put the gun, wrapped in a blue rag, in a hole between two fences in the backyard of Lopez’s brother’s house.
The following morning, October 8, 2003, Murray and Lopez drove to Murray’s girlfriend’s house in Framingham. A Framingham police detective stopped Murray and Lopez, who were in a gray Ford Taurus with New Jersey license plates, as they left Murray’s girlfriend’s house.[7] Massachusetts State Troopers, including Trooper Richard Mahoney (“Mahoney”), then arrived at the scene. Murray was arrested and his car seized.
Police later recovered from the Kendall Street crime scene a knife, four .25 caliber cartridge cases,[8] one spent projectile, four cigarette butts, ajuice bottle, and two bats, although it appeared that the bats had not been left there recently; they recovered two projectiles from the victim’s body. The gun, a .25 caliber Colt, was recovered on October 8, 2003, in Woonsocket, Rhode Island, wrapped in a light blue hand towel and located in a hole between two fences; it was later identified as having fired the recovered cartridge cases and projectiles.
II. Mentions of KST at Trial
On cross-examination of Campbell, defense counsel asked if he knew of the KST gang. Campbell replied that KST was not a gang but a group of friends; Campbell testified that he himself was a member but that Murray was not. On cross-examination of Theodore Hers (“Piers”), a Framingham police detective, defense counsel asked him if he was familiar with KST, and who its members were. The court permitted defense counsel to use the word “group” to describe KST, rather than “gang.”[9] Piers testified that while he knew the “KS” stood for Kendall Street, he did not know what the ‘T’ stood for. He also identified Campbell, Bonner, Perez, and Porter as members as of 2003.
On cross-examination of Waters, defense counsel pointed out the tattoo of “KST’ that Waters had on the side of his neck, and, in response to questioning, Waters testified that the “KS” stood for “Kendall Street” and the T stood for “(j]ust S-T, it’s like it’s plural.” Transcript, Vol. V, at 125. Waters testified that KST consisted of “a bunch of kids that’s growing up” and that he had been in KST since he was young. Id. There were less than twenty-five people in KST, but Waters stated that they “were all just a group, just a bunch of kids. It’s not nothing serious.” Transcript, Vol. V, at 126. He testified that Bonner, Porter, and Porter’s brother were members; the victim and Campbell were not.
On cross-examination, Bonner testified that he was a member of KST, which stood for “Kendall Street,” and which was “just a bunch of kids; [they] came up together. [Bonner] lived on Kendall Street. That was pretty much where [they] hung out at.” Transcript, Vol. V, at 159-60. Bonner stated that KST “associated with” the victim, but KST did not characterize people as “official or unofficial” members. Transcript, Vol. V, at 160-61. Perez testified on cross- examination that he was a member of KST, as were Bonner, Campbell, Waters, and the victim.
On direct examination, after Lopez testified that when Murray saw the victim at Beaver Park on October 7, 2003, he asked him if the victim and KST planned to rob Murray. He also testified that KST stood for “Kendall Street Team” and consisted of the victim, Porter, Salvi, Waters, “and all the other kids they hang around with.” Transcript, Vol. VI, at 105.
During his cross-examination, Mahoney testified to his knowledge of a group of men who call themselves KST, which he stated stood for “Kendall Street Team and just Kendall Street. That’s where they all hang around.” Transcript, Vol. VII, at 125. He testified that many of the individuals who were present on Kendall Street on October 7, 2003, were members of KST.
In his closing argument, defense counsel argued that the victim “was a member of a gang. And he had all his guys with him too” on Kendall Street when Murray arrived. Transcript, Vol. IX, at 24. Murray himself was not a member of a gang. KST, defense counsel argued, was “no basketball team.” Transcript Vol. IX, at 27.
During closing argument, the Commonwealth discussed premeditation, reminding the jury that Murray told Mahoney that he had purchased the gun because he was having trouble with the victim. Murray
takes that gun, he takes the magazine, he buys bullets, he puts the magazine in that gun and he takes that gun and his hides it. And prior to going to Kendall Street, he has an altercation with [the victim] at Beaver Street with the pit bull. Does that sound like someone who’s afraid of [the victim]? Does that sound like someone that is trying to stay away from [the victim], has to buy a gun because [the victim is] a big, bad gang member? [The Commonwealth] suggests], ladies and gentlemen, there was no evidence that [the victim] was a big, bad gang member.
Yeah, he had a group of friends that he hung out with, and some of them had tattoos of KST, but you didn’t hear any evidence that [the victim] was after Eric Murray or had been stalking Eric Murray to the point that [Murray] was going to be afraid.
*370 Transcript, Vol. IX, at 39-40.
III. Commonwealth’s Motion in Limine to Limit Certain References Concerning the Victim
On the third day of testimony and after the direct examination of Waters, counsel was heard, outside the presence of the jury, on the Commonwealth’s motion to limit references to the victim’s criminal record, his reputation for violence, and specific instances of the victim’s alleged violent conduct. In its motion, the Commonwealth indicated that it intended to offer evidence of an alleged altercation that occurred between the defendant and victim earlier in the day on October 7, 2003. The Commonwealth requested that the court hold a voir dire if the defendant intended to offer evidence of violent acts by the victim, and “that defendant not mention any reputation evidence in his opening without notifying the court prior to openings. The Commonwealth is unaware of any such evidence and any attempt to bring out such testimony would be an attempt to malign the victim.” Commonwealth’s Motion, at 9.
Further, the Commonwealth noted that the court “has the discretion to determine whether any alleged acts of violence committed by the victim and supposedly known to the defendant are too remote and would result in undue inquiry into collateral matters . . . because the central issue with respect to such evidence is ‘not what the victim actually did in the specific instances, but rather what was in the defendant’s mind when he confronted the victim.’ ” Commonwealth’s Motion, at 9-10, citing Commonwealth v. Bennett, 41 Mass.App.Ct. 920, 921 (1996), quoting Commonwealth v. Fontes, 396 Mass. 733, 737 (1986). Finally, “the Commonwealth request(ed) that defense counsel be instructed not to make any reference to the victim’s criminal record as such evidence is improper.” Commonwealth’s Motion, at 10, quoting Commonwealth v. Degro, 432 Mass. 319, 324 (2000).
At the hearing, defense counsel indicated that, if Murray were to testify, he would “testify as to what his mental state of mind was based on what he knew or believed that he knew with respect to any propensity for violence that [the victim] may have had." Transcript, Vol. V, at 115. Therefore, defense counsel stated, he intended to cross-examine Waters on the victim’s “prior history perhaps for either violence [or] whether or not he has been in possession of a firearm in Mr. Waters!’] presence before, had he used a firearm in Mr. Waters]’] presence.” Transcript, Vol. V, at 114-15.
The Commonwealth countered with the argument that the law clearly stated “that character evidence is inadmissible to prove that an individual acted in conformity with that character on a given occasion unless it relates to the defendant and the defendant’s state of mind. So what Mr. Waters knows about [the victim], as to whether or not [the victim] was carrying a gun that day or any other time or whether he ever saw [the victim] with a firearm is not admissible . . . [T]he only way it would be admissible is if Mr. Murray knew that and had information to that. And it has nothing to do with Mr. Waters.” Transcript, Vol. V, at 115-16. The court agreed with the Commonwealth and ruled that defense counsel could not “inquire of the witness about those issues.” Transcript, Vol. V, at 116.
Defense counsel also stated his intent “to ask Mr. Waters with regards to his membership in this group known as the KST and questions along those lines.” Transcript, Vol. V, at 115. The Commonwealth did not object to defense counsel asking Waters “whether he knows KST or what it stands for, . . . whether he personally had something to do with KST.” Transcript, Vol. V, at 116-17.
IV. Motion to Suppress
Murray moved to suppress the statements that he made to police on October 8, 2003, on the basis that the police had obtained the statements from the defendant in violation of Miranda v. Arizona, 384 U.S. 436 (1966), and the federal and state constitutions. At the May 2004 hearing on the defendant’s motion, this court (Brassard, J.) rendered its findings of fact and conclusions of law, expressly stating that it did not find Murray’s affidavit credible.
A. Findings of Fact
On October 8, 2003, Framingham police and Massachusetts State Police picked up Murray and Lopez for questioning in the victim’s shooting death. The police handcuffed Murray and Lopez and brought them to the Framingham police station: they removed the handcuffs from the two men and placed them in separate rooms.
In the room with Murray were Massachusetts State Trooper Mahoney, assigned to the Middlesex County District Attorney’s Office, and then-Framingham police detective Kevin Slattery (“Slattery”). Both Mahoney and Slattery were in plainclothes. Mahoney advised Murray of his Miranda rights, using a preprinted Framingham police department form. Verbally, Murray indicated his understanding of his Miranda rights and agreed to waive them. Mahoney recorded Murray’s understanding and his waiver by checking off spaces on the form. After reading the form, Murray signed it, as did Mahoney and Slattery.
Murray admitted to knowing the victim from having purchased marijuana from him, and he expressed surprise when Mahoney and Slattery told Murray of his death. Mahoney and Slattery inquired into Murray’s itinerary on October 7, 2003, and Murray informed him that, during the day, he purchased marijuana from the victim in Beaver Park in Framing-ham. The transaction was uneventful, and, thereafter, Murray drove to Rhode Island with Lopez and was in Woonsocket, Rhode Island, at 9:00 p.m. on October 7. He stated that he learned about a shooting when he called his girlfriend from Woonsocket, and he spoke *371 with a Miss Hodge who told him that the police were looking for him. At this point, the police challenged Murray’s statement because he had stated earlier that he did not know about the shooting; Murray acknowledged that he did know about it.
Murray told the police that he returned to Framing-ham on the morning of October 8, 2003, with a person whose name he did not know. Murray denied being present at the Kendall Street area at the time of the shooting. In response to the police informing him that several people had seen Murray there, Murray amended his statement to say that he was there to purchase marijuana from the victim who was there with his “boys.” Murray approached the victim with Lopez to the right of the victim and Pervis to the left of the victim. The conversation that ensued between Murray and the victim concerned whether a robbery was going to take place. The victim then came at Murray, and the victim’s boys began to confront Murray and his friends. Murray stated that “Troy” shot the victim.
The police asked Murray about Troy, and Murray stated that Troy was a friend from Boston whose last name he did not know. When Murray explained that Troy had been standing right behind Murray during the critical moments, the police said that Troy’s location meant that he would have shot Murray, not the victim. At this point, Murray admitted that he shot the victim.
When the victim had come at Murray, one of the victim’s friends made a comment that Murray understood as meaning that they were going to get their guns. Upon hearing that comment, Murray went to his car to retrieve a weapon, a .25 caliber gun he had purchased from Troy. He shot the victim two or three times, then dropped the gun. He speculated that the victim’s friends picked up the gun, but, when the police said that this occurrence did not seem plausible, Murray said that he threw out the gun at the CVS parking lot.
Murray asked how the victim was doing, and the police informed him that the victim was dead. He did not believe the police at first but, after they repeatedly informed him that the victim was dead, Murray effectively acknowledged that he was in a lot of trouble and going away.
Murray was cooperative, casual, and coherent throughout the interview; he admitted to having taken marijuana the previous night. Murray did not ask for an attorney at any point during the interview, although near the end of the interview, Murray asked generally about the nature of the process that he would be facing, such as being held, bail, and court procedures. Mahoney responded with a general description of the process and included a comment that the court would appoint an attorney to represent him. The police told Murray of his right to make a phone call, and Murray declined to exercise his right at that point.[10] The police also offered Murray the option of audiotaping his confession, but Murray stated that he preferred to have a written statement.
Murray drew a diagram of the location and stated that he had thrown the gun into nearby bushes in a blue face cloth or dish towel. After other police officers searched the area and could not find the gun, the police drove Murray to the location. They were unable to recover the gun, and on the way back to the police station, Murray stated that he had been driving a gold Camiy when he dropped the gun, contrary to his earlier statement that he had been driving a Taurus, which was the type of vehicle he had been driving when the police had picked him up. Murray laughed about keeping his lies straight.
Back at the police station, in response to Murray’s requests, the police permitted Murray to smoke a cigarette and to meet briefly with his girlfriend. Murray and his girlfriend met in another location at the police station at which time Murray’s girlfriend observed to Mahoney that Murray should get an attorney. Thereafter, Mahoney prepared two written statements while sitting at a computer in a cubicle with Murray. Murray had Mahoney make changes while Mahoney was typing, then Murray read both statements and signed them.
The entire interview, including a trip to a nearby CVS store, lasted approximately five hours.
B. Conclusions of Law
Murray received his Miranda warnings which he understood and knowingly, intelligently, and voluntarily waived. Entirely distinct from receipt of his Miranda warnings, Murray made his statements voluntarily. Murray freely spoke with the officers, and there was no indication that any coercion, misunderstanding, or intimidation took place.
The court accordingly denied Murray’s motion to suppress the statements he made to police.
V. Jury Instructions
A. Hearings on Jury Instructions
At a hearing on jury instruction requests, the Commonwealth requested that the court give a voluntary manslaughter instruction on the use of excessive force in self-defense; defense counsel requested that the court also instruct on reasonable provocation, although he admitted that it was “a close call . . .” Transcript, Vol. VIII, at 122. Relying on Commonwealth v. Walker, 443 Mass. 213 (2005), the Commonwealth argued that there was no evidence of provocation because there was no testimony of sudden combat or of fighting words. The court did not give an instruction on reasonable provocation but noted that Murray had “saved” his rights as to his objection to that omission. Transcript, Vol. IX, at 85.
With respect to defense counsel’s self-defense instruction request, defense counsel asked the court to include language regarding the victim’s reputation. In *372 support, defense counsel argued that there was testimony that “Murray had heard that he was going to be robbed by [the victim].. . that in and of itself is violent conduct that he knew about.” Transcript, Vol. IX, at 7-8. The Commonwealth argued that the victim’s reputation should not be included because there was “no evidence that the defendant was aware of any reputation . . . Lopez said that he knew that [the victim] was friends with the KST. There was other testimony. Some of them had [the victim] as a KST member, some didn’t. But there’s no evidence . . . that the defendant knew of any violent behavior by the victim in this case ...” Transcript, Vol. IX, at 7. Evidence that Murray thought the victim was going to rob him was “not reputation, that’s that fact that he heard that [the victim] was going to rob him. That’s not reputation that he was a robber, that he was robbing everybody and that he was a gang member and that he beat up on everybody . ..” Transcript, Vot IX, at 8. The court did not instruct on reputation, but the court instructed the jury that they could “consider evidence of threats of violence made by the deceased against the defendant if the defendant was aware of such threats.” Transcript, Vol. IX, at 9-10.
The Commonwealth also requested instructions on both deliberate premeditation and extreme atrocity and cruelty. Defense counsel argued that there was no evidence of the latter, but the court instructed on both.
B. Self-Defense and Manslaughter Jury Instructions
The court instructed the juiy on self-defense as follows:
A homicide is excused and is therefore not a crime if it results from the proper exercise of self-defense, as I’m going to define it for you . . . The Commonwealth must prove beyond a reasonable doubt that the defendant did not act in self-defense. If the Commonwealth fails to prove beyond a reasonable doubt that the defendant did not act in self-defense, you must find the defendant not guilty, in other words, if you have a reasonable doubt whether the defendant acted in self-defense, your verdict must be not guilty.
. .. [T]he proper exercise of self-defense means that a person in the defendant’s circumstances would reasonably believe that he was about to be attacked and that he was in immediate danger of being killed or seriously injured, and that there was no other way to avoid the attack. A person using a dangerous weapon must also have actually believed that he was in imminent danger of serious harm or death. A person may not use force in self-defense until he has availed himself of all proper means to avoid physical combat.
A person who reasonably, but mistakenly, believes that he is in imminent danger of serious bodily harm or death, and that he has used all proper means to avoid the use of force, may still use deadly force to defend himself.
. . . [I]n considering the issue of the reasonableness of a defendant’s belief and whether a defendant actually believed he was in imminent danger of serious bodily harm or death, you may consider the circumstances bearing on the issue of the defendant’s state of mind, as you find them to be, based upon the evidence. You may consider evidence of threats of violence made by the deceased against the defendant if the defendant is aware of the threat.
In considering the issue or the reasonableness of any force used by the defendant, you may consider evidence of the relative physical capabilities of the combatants — how many people were involved on each side, the characteristics of any weapon used, the availability of room to maneuver or any other factors that you the juiy deem relevant to the defendant’s conduct under all the circumstances, as you find them to be.
The law does not permit retaliation or revenge. The proper exercise of self-defense arises from necessity and ends when the necessity ends. An individual may use only sufficient force to prevent occurrence or recurrence of the attack. The question of how far a party may properly go in self-defense, however, is to be considered by you the juiy with due regard for human impulses and passions and is not to be judged too strictly.
So to reiterate, where there is evidence that the defendant may have acted in self-defense, the Commonwealth must prove beyond a reasonable doubt that the defendant did not act in self-defense as I have defined it. If the Commonwealth falls to prove beyond a reasonable doubt that the defendant did not act in self-defense, then you must find the defendant not guilty.
Transcript, Vol. IX, at 65-68.
Later in the charge, the court informed the jury that the issue of manslaughter involved in this case “concerns whether there was excessive force in self-defense.” Transcript, Vol. IX, at 72. The court instructed the juiy that, if they found that the Commonwealth failed to prove beyond a reasonable doubt first degree murder under either deliberate premeditation or extreme atrocity or cruelty or second degree murder, they must then consider the issue of voluntaiy manslaughter.
[W]hen I talk about voluntary manslaughter, I’m talking about the excessive use of force in self-defense, that’s the theoiy. Voluntary manslaughter is an intentional — the Commonwealth must prove beyond a reasonable doubt that there was an intentional unlawful killing — and you will have in mind what I said about the issue of intent and unlawful killing — and that the intentional unlawful killing *373 was caused by excessive force in self-defense. So you’re going to be considering whether there was intentional and unlawful killing of another human being as a result of the use of excessive force in self-defense.
In this case you must consider whether the Commonwealth has proven beyond a reasonable doubt that the defendant used excessive force in defending himself. If the Commonwealth proves beyond a reasonable doubt that the defendant used excessive force in defense of himself that caused the death of the deceased, you should return a verdict of guilty of voluntary manslaughter. If the Commonwealth fails to prove the defendant used excessive force in rightly defending himself, then you must not return a verdict of guilty of voluntary manslaughter through the use of excessive force in self-defense.
Transcript, Vol. IX, at 84-85.
Finally, after a sidebar at which the Commonwealth requested language in the self-defense charge regarding retreat, the court instructed the jury as follows:
If the defendant had reasonable grounds to believe and did believe that he had done everything possible under the circumstances, including retreat, if possible, to avoid physical combat, he was entitled to the privilege of self-defense.
If the Commonwealth proves beyond a reasonable doubt the absence of the privilege of self-defense, then the defendant did not have the right of self-defense.
Transcript, Vol. IX, at 88-89.
On the first day of their deliberations,[11] the jury sent a question to the court asking for the definitions of premeditation, extreme atrocity and cruelty, murder in the second degree, and manslaughter. The court repeated its original instructions on those subjects, then, at sidebar, defense counsel asked the court to repeat the self-defense instruction as well “because that’s included really in the voluntary manslaughter . . . (E)xcessive force is in self-defense. You’re really making reference to it without defining it.” Transcript, Vol. X, at 18. The court did not re-instruct on self-defense because the jury’s question did not include self-defense.
VI. Affidavit of Lieutenant Kevin Slattery[12]
Murray has submitted the affidavit of Framingham Police Lieutenant Slattery. The affidavit is dated June 21, 2007,[13] and, by its terms, was submitted “in support of the government’s motion pursuant to 18 U.S.C. §3142(f)(l)(c) that [certain] defendants be detained pending trial...” Slattery Affidavit, ¶1. Slattery explained that he believed the defendants (“KST defendants”) should be detained pending trial because “[e]ach of the [KST] Defendants in this case are either leaders, members, or associates of KST, and each has, in [Slattery’s] opinion, promoted violence and had endangered the Framingham community. All of the [KST] Defendants have demonstrated that they are drug traffickers dedicated to the continued operation of KST and its violence and drug dealing.” Slattery Affidavit, 9134. Among the KST defendants listed in the affidavit are James Salvi and Emmanuel Osamwonyi; the latter was present on Kendall Street at the time of the victim’s shooting on the night of October 7, 2003, and the former arrived on Kendall Street immediately after the shooting.
Slattery explained that he first learned of KST— which stands for Kendall Street Thugs or Kendall Street Team — in 2001 when he was investigating an armed robbery that occurred on Kendall Street. He “learned that KST is a loosely organized group of individuals responsible for a disproportionate share of the drug trafficking and gang violence in Framing-ham[,]” Slattery Affidavit, 919, and that Salvi was one of its founding members. “As signs of their solidarity, members and associates of KST frequently have KST tattoos, or wear similar articles of clothing, or a medallion, to identify themselves as a group.” Slattery Affidavit, 9112. “For example, at the 2003 Boston Marathon, KST members made their presence known by wearing oversized white shirts imprinted with K.S.T. Some KST members wore shirts that depicted guns firing bullets bearing the words ‘KST ain’t no joke.’ ” Id.
Slattery was
aware of numerous stabbings and shootings committed by and against members of KST. For example, on October 25, 2003, KST member Joseph McDaniels, a/k/a “Joe Bucks,” was shot and killed on Kendall Street in the presence of many KST members. A shrine was built at the scene of McDaniels’ murder with the words “Stop Snitchin” prominently displayed as a warning to anyone who contemplated cooperating with the police.
Slattery Affidavit, 919.
Further, the Framingham police have responded “to numerous community complaints about drug dealing, harassment, and assaults by KST members and associates [; and]... to complaints of group fights involving men with baseball bats, . . . later learning] that the aggressors in the fight were KST members or associates.” Slattery Affidavit, 9H0. “KSTmembers have been involved in numerous fights or violent disputes and . . . they rely on one another for assistance . . . often arriv[ing] to fight in groups of 8-10 people in an effort to intimidate others." Slattery Affidavit, 9111. KST members “rarefy cooperate with police; even when they are the victims of violent crimes ...” Slattery Affidavit, 9114. For example, “on October 28, 2005, Joseph McDaniels’ brother, Robert McDaniels, was shot and nearly killed while he was walking with JAMES SALVI. Then, on November 27, 2005, JAMES SALVI was stabbed repeatedly and was found by police lying at the entrance of a hospital emergency room in Framing-ham. Neither SALVI nor McDaniels [was] willing to *374 cooperate with the police” in their investigation. Id. (capitalization in original).
Since 2004, a “multi-level enforcement team has investigated the leaders, members, and significant criminal associates of KST." Slattery Affidavit, ¶4. “(O)ne of the principle objectives [of this investigation] was to gain intelligence regarding the leadership and general organization of KST as well as their sources of supply for controlled substances.” Slattery Affidavit, ¶7. Over the course of the investigation, law enforcement “agents and officers executed a number of state search warrants at the homes of KST members, including some of the [KST] Defendants [pursuant to which] agents and officers have seized more than three hundred grams of crack cocaine, several firearms, and more than $40,000.00 in drug proceeds.” Slattery Affidavit, ¶6.
In addition to executing search warrants during the investigation, “law enforcement agents have successfully made more than 35 controlled purchases of [crack] . . . from members and associates of the gang. All of these purchases were made in the Framingham area” from the KST defendants. Slattery Affidavit, ¶4. During some of these controlled drug purchases, KST defendants “made statements offering to sell firearms to [cooperating witnesses], and discussing their ability to procure firearms.” Slattery Affidavit, ¶5. Most relevant to this case, Salvi “made four sales of crack cocaine to a [cooperating witness] totaling over 5 grams[,]” Slattery Affidavit, ¶17, and Emmanuel Os-amwonyi “sold crack cocaine to an undercover police officer four times, totaling more than 9 grams[,]” Slatt-ery Affidavit, ¶31, but neither Salvi nor Osamwonyi offered to procure firearms for the cooperating witnesses or law enforcement agents.
VI. Newspaper Article
Murray has also submitted an article from The Metrowest Daily News (“2008 article”), dated April 8, 2008, written by Normal Miller and titled “Gang ‘general’ pleads guilty, faces at least 10 years in prison.” The 2008 article stated that members of KST, which stands for “Kendall Street Thugs ... or the Kendall Street Team, were arrested in July[14] after a three-year federal investigation called Operation Thunderdome.” (Footnote added.) This article announced that a fourth KST member had recently pled guilty in U.S. District Court “to several cocaine trafficking charges.” Most of the information in the 2008 article is similar to that in the Slattery Affidavit, and quotes another Slatteiy affidavit detailing the arrest of Lahashid Santiago.
DISCUSSION
I.Mass.R.Crim.P. 30(b) Standard
“The trial judge upon a motion in writing may grant a new trial at any time if it appears that justice may not have been done.” Mass.R.Crim.P. 30(b). While the granting of a new trial is within the discretion of the judge, “that discretion is not boundless and absolute.” Commonwealth, v. Genius, 402 Mass. 711, 714 (1988), citing Commonwealth v. Preston, 393 Mass. 318, 324-25 (1984). “Judges are to apply the standard set forth in rule 30(b) rigorously and should only grant such a motion if the defendant comes forward with a credible reason which outweighs the risk of prejudice to the Commonwealth.” Commonwealth v. Wheeler, 52 Mass.App.Ct. 631, 635-36 (2001).
II. Evidentiary Hearing
The court should only hold an evidentiary hearing if the defendant raises a substantial issue that is supported by a substantial evidentiary showing. Commonwealth v. Lopez, 426 Mass. 657, 663 (1998); Commonwealth v. DeVincent, 421 Mass. 64, 67 (1995). Otherwise, a court “may decide a Rule 30(b) motion based solely on affidavits [and] may discredit untrustworthy affidavits . . .” Lopez, 426 Mass. at 663; see Mass.R.Crim.P. 30(c)(3) (concerning post-conviction procedure). In fact, the primary purpose of Rule 30(c)(3) is to encourage the court to dispose of post-conviction motions upon the supporting affidavits. Commonwealth v. Stewart, 383 Mass. 253, 260 (1981). The decision to hear oral testimony or decide the motion on the basis of affidavits is within the judge’s discretion. Id. at 257. In making this determination, the court must consider not only the seriousness of the issue asserted but also the adequacy of the defendant’s showing with respect to those asserted issues. Id. at 257-58.
The court held a non-evidentiary hearing on May 7, 2009, on Murray’s motion for new trial. An evidentiary hearing is unnecessary as the parties’ papers combined with the Slattery Affidavit and trial transcript are sufficient to enable this court to reach a decision.
III. Motion to Suppress
In his motion to suppress, a two-paragraph document filed in March 2004, Murray sought the suppression of any and all statements made by him to the police arguing the police obtained those statements in violation of his rights under Miranda v. Arizona, 384 U.S. 436 (1966), under the Fifth, Sixth, and Fourteenth Amendments to the Constitution, and under Article 12 of the Massachusetts Declaration of Rights. His accompanying affidavit focused on the voluntariness of his statements. This court (Brassard, J.) denied Murray’s motion, concluding that- Murray knowingly, intelligently, and voluntarily waived his Miranda rights and that he made his statements voluntarily.
In his motion for new trial, Murray argues that his statements to the police on October 8, 2003, should have been suppressed because the police did not advise him of his right to make a telephone call until after they interviewed him. As Murray did not raise this issue in his original motion to suppress, he has waived it. E.g., Commonwealth v. Williams, 68 Mass.App.Ct. 287, 288 n.1 (2007) (affirming denial of motion for new trial “insofar as it sought reconsidera *375 tion of the motion to suppress” where lower court “ruled that the defendant waived the argument by not raising it in the motion to suppress”). Even if Murray had not waived this argument, however, he would still not be entitled to suppression.
Under G.L.c. 276, §33A, the police “shall permit the use of the telephone ... for the purpose of allowing the arrested person to communicate with his family or friends, or to arrange for release on bail, or to engage the services of an attorney. Any such person shall be informed forthwith upon his arrival at such station... of this right to so use the telephone, and such use shall be permitted within one hour thereafter.” Murray argues that he was not informed of his right until after several hours of interrogation while in custody. These telephone rights, however, “are triggered by the defendant’s/ormoiarrest, not by the ‘custodial’ nature of any pre-arrest interrogation.” Commonwealth v. Dagley, 442 Mass. 713, 719 (2004) (emphasis added), citing Commonwealth v. Rivera, 441 Mass. 358, 374-75 (2004). Murray does not claim that he was denied his telephone right after his arrest.[15]
Notwithstanding Murray’s waiver of this issue, he is not entitled to a new trial on this basis because there was no violation of his telephone rights under G.L.c. 276, §33A.
IV. Manslaughter Juiy Instruction
“Voluntary manslaughter is an unlawful killing ‘arising not from malice, but from. . . sudden passion induced by [1] reasonable provocation, [2] sudden combat or [3] excessive force in self defense.’ ” Commonwealth v. Espada, 450 Mass. 687, 694 (2008) (ellipses in original), quoting Commonwealth v. Acevedo, 446 Mass. 435, 443 (2006). At trial, Murray argued that the evidence supported instructions on all three theories. The court instructed the jury on the third theory only, denying Murray’s request with respect to the first two theories.
Murray argues that the court’s denial of Murray’s request to include reasonable provocation and sudden combat in the jury instructions on voluntary manslaughter was erroneous and entitles him to a new trial because the evidence at trial raised both issues.[16] Defense counsel objected to the denial of his request, thus Murray did not waive this argument. See Mass.R.Crim.P. 24(b) (“No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, specifying the matter to which he objects and the grounds of his objection”); see, e.g., Commonwealth v. Grenier, 415 Mass. 680, 686 n.8 (1993) (holding that defendant saved his rights where judge had “denied the written request during a charge conference and stated that the defendant’s exception was saved”[;] and holding that defendant “was not obliged to repeat his objection after the charge was given” because judge established “at the charge conference that the judge would not give the requested instruction”). When a defendant has made a timely objection to a jury instruction, the “court will review the instruction to determine whether there was error and, if so, whether it was reversible error.” Commonwealth v. Farley, 443 Mass. 740, 745 (2005). “[T]he adequacy of instructions must be determined in light of their overall impact on the jury.” Id. (alteration in original), quoting Commonwealth v. Sellon, 380 Mass. 220, 231-32 (1980).
First, “for sudden combat to be the basis of a voluntary manslaughter instruction, the ‘victim must attack the defendant or at least strike a blow against the defendant.’ ” Espada, 450 Mass. at 696-97 (ellipses in original, quoting Commonwealth v. Pasteur, 66 Mass.App.Ct. 812, 822 (2006). Viewing the evidence in the light most favorable to Murray, Commonwealth v. Gaouette, 66 Mass.App.Ct. 633, 639 (2006), there was absolutely no evidence at trial that the victim struck Murray when they met on Kendall Street. Although there was physical contact between the victim and Murray when they met at Beaver Park, the testimony described the victim as reacting to Murray’s placing his hands on the victim’s pants. Murray was not entitled to an instruction on sudden combat.
Second, an instruction on reasonable provocation “is not appropriate unless there is evidence that, when considered in the light most favorable to the defendant ‘a reasonable person would have become sufficiently provoked and would not have "cooled off' by the time of the homicide, and that in fact a defendant was provoked and did not cool off.’ “ Commonwealth v. Benson, 453 Mass. 90, 95 (2009), quoting Commonwealth v. Zagrodny, 443 Mass. 93, 106 (2004). At Murray’s trial, the jury heard evidence that Murray and the victim had seen each other at Beaver Park on October 7, 2003, prior to meeting up at Kendall Street, and that there was some physical contact between the two when Murray asked the victim if he planned to rob Murray. They heard that when Murray arrived at Kendall Street and started walking towards the victim, the victim said, ’’Let’s have a one on one" when he saw Murray on Kendall Street, and one of the people behind the victim on Kendall Street said, “You trying to bring it to my man? You wanna get popped?” The jury also heard testimony that the victim waived his arms with open hands, and stood with his hands fisted in a fighting stance as he walked towards Murray. There was also testimony from Mahoney that Murray said in his statement to police on October 8,2003, that when he heard one of the people behind the victim say, “You wanna get popped?” he went to his car to retrieve his gun because he believed the comment meant that they were going to get their guns.
“This sequence of events is incompatible with provocation!,]” Benson, 453 Mass. at 97, and is therefore insufficient to support an instruction on reasonable provocation. The evidence at trial demonstrated that “[o]n the day of the killing, [Murray’s] actions were *376 deliberate, not passionate!,]” id. at 97, especially in light of Murray’s claim that he returned to his car to retrieve his gun after seeing the victim and the others behind him on Kendall Street and that there was no evidence that the victim was holding a weapon. See, e.g., Gaouette, 66 Mass.App.Ct. at 641 (concluding that defendant was not entitled to provocation instruction where he “show[ed] up at a predetermined location for the specific purpose of fighting, and arm[ed] himself with a gun for the occasion ... [then] that fight escalate[d] into even more violence and he use[d] the gun to shoot and kill his victim”).
Murray’s motion for new trial on the basis that the court erroneously refused to instruct on reasonable provocation and sudden combatís accordingly denied.
V. KST Evidence
The Slattery Affidavit demonstrates that an investigation into KST was pending at the time of Murray’s trial. The Commonwealth has conceded the veracity of the statements in the Slattery Affidavit. Murray makes two arguments with respect to KST and the victim’s association with it. First, evidence of the victim’s alleged membership in KST, his specific acts of violence, and his companions’ specific acts of violence should have been admitted under the common-law rule of evidence set forth in Commonwealth v. Adjutant, 443 Mass. 649 (2005), to resolve the issues of first aggressor and of Murray’s reasonable provocation. Second, the information concerning KST that the investigation revealed was exculpatory, and the Commonwealth’s failure to disclose that exculpatory evidence was a violation of Murray’s constitutional rights that entitles him to a new trial. Although they are different inquiries — the former is a common-law rule of evidence, the latter is a constitutional right— their analyses overlap and the conclusion as to the latter informs the former.
A. Adjutant
“[E]vidence of a victim’s violent character may be admitted to support a [defendant’s] claim of self-defense under two distinct theories. First, it may be admitted to prove that at the time of the assault the defendant was reasonably apprehensive for his safety, and used a degree of force that was reasonable in light of the victim’s violent tendencies.” Adjutant, 443 Mass. at 654. The law in Massachusetts as to this theoiy is well-established, permitting “the introduction of the victim’s violent character, if known to the defendant, as it bears on the defendant’s state of mind and the reasonableness of his actions in claiming to have acted in self-defense.” Id., citing Commonwealth v. Fontes, 396 Mass. 733, 735-36 (1986), Commonwealth v. Edmonds, 365 Mass. 496, 502 (1974). This evidence is admissible in the form of the victim’s specific acts of violence “when relevant to the defendant’s reasonable apprehension of imminent bodily harm[,]” id. at 662, as well as in the form of the victim’s reputation when relevant to “a defendant’s subjective state of mind, and the reasonableness of the actions thereby taken to defend himself. . .” Id. at 664.
Second, evidence of a victim’s violent character may also be admitted “as tending to prove that the victim and not the defendant was likely to have been the ‘first aggressor,’ where there is a dispute as to who initiated the attack.” Id. at 654. It was admissibility under this theory that the Supreme Judicial Court addressed in Adjutant as a matter of first impression. Id. (“This court has not. . . had occasion to rule on the second theoiy .. . regarding the use of such evidence to prove who was the first aggressor”). The Court held that “evidence tending to show the victim’s violent character should be admissible for the limited purpose of supporting the defendant’s self-defense claim that the victim was the first aggressor!,]” id. at 660, and it is admissible not in the form of reputation evidence, id. at 664-65, but only in the form of “specific acts of prior violent conduct that the victim is reasonably alleged to have initiated ...” Id. at 664.
In adopting this “new common-law rule of evidence!,]” the Court expressly made its application prospective. Id. at 666. Despite this explicit pronouncement, the Court in Commonwealth v. Pring-Wilson, 448 Mass. 718 (2007), affirmed the lower court’s retroactive application of the Adjutant rule, holding that,
[w]here the defendant had persistently attempted to introduce evidence of [the victim’s] and [his cohort’s] violent histories to support the central issue at trial — whether he had acted in self-defense — and where the defendant’s conviction had not yet become final when he moved for a new trial, [the Court] cannot say that the [lower court] judge’s conclusion that “fairness require[d]” granting the defendant a new trial was an abuse of her broad discretion to see that justice is done.
Id. at 737 (final alteration in original).
With respect to the first part of that holding, the Court more accurately articulated “the central issue at trial” as the “hotly contested” matter of “[t]he identity of the first aggressor . . .” Id. at 733. “(T]he identity of the first aggressor was essential, and the defendant sought aggressively and repeatedly [but, ultimately, unsuccessfully] ... to introduce evidence of [the victim’s] and [his cohort’s] violent histories to illuminate the matter.” Id. at 736-37. For example, when the Commonwealth objected at trial to defense counsel’s line of cross-examination of the victim’s cohort, defense counsel “claimed that his line of questioning was relevant to [the victim’s] and [his cohort’s] states of mind, and who during the fight ‘instantly’ had the ‘upper hand.’ ” Id. at 730. Later during cross-examination of that same witness, defense counsel sought “to introduce evidence that [the victim] had never lost a fight except one” because “it related to ‘[w]ho was the first aggressor . . . the believability of whether [the victim] would wait for [the defendant] to open the door *377 to the car before flying out.’ . . .’[T]he issue is who started it, whether [the defendant] was the initial aggressor, [or] whether [the victim] was ...’ ” Id. at 731 (alterations in original) (final ellipses added).
Thus, in Pring-Wilson, the defendant’s purpose at trial in seeking to introduce evidence of the victim’s and his cohort’s violent histories was to establish that they, and not the defendant, were the first aggressors. Id. at 730-31, 736-37. Similarly, in Adjutant, where the Court announced that its new rule of evidence was to apply prospectively, the Court applied the rule to the defendant in that case, “noting that the identity of the first aggressor was paramount in her case; that she had sought at trial to introduce evidence of the victim’s prior violent acts to address the first aggressor question; and that she had pressed the matter on appeal.” Pring-Wilson, 448 Mass. at 736, citing Adjutant, 443 Mass. at 664, 666.
Here, the Commonwealth argues that Murray cannot benefit from Adjutant because of that Court’s express pronouncement of prospective application. Murray seeks the retroactive effect from which the defendants in Pring-Wilson and Adjutant benefitted because his case was pending on direct appeal at the time the Supreme Judicial Court decided Adjutant. Despite his status at the time of the Court’s decision,[17] Murray has satisfied the second prong necessaiy for retroactive application. Pring-Wilson, 448 Mass. at 737 (articulating second prong as “defendant’s conviction had not yet become final when he moved for a new trial”). Murray, however, cannot satisfy the first prong, i.e., that he attempted to introduce evidence of the victim’s violent acts to support his position on the issue of first aggressor.
The Court’s “decision in the Adjutant case is specifically limited to situations where the defendant claims self-defense and the identify of the first aggressor is in dispute.” Commonwealth v. Benoit, 452 Mass. 212, 228 (2008). During the trial in this case, Murray did not raise the issue of first aggressor as the basis for seeking evidence concerning the victim’s prior violent acts. At trial, the court allowed the Commonwealth’s motion in limine to limit references to the victim’s criminal record, his reputation for violence, and specific instances of the victim’s alleged violent conduct. Murray had opposed this motion on the grounds that, if Murray himself testified, he would “testify as to what his mental state of mind was based on what he knew or believed he knew with regard to any propensity for violence that [the victim] may have had.” Transcript, Vol. V, at 115 (emphasis added). To that end, then, Murray sought to question Waters about whether the victim had been in possession of or had used a firearm in Waters’ presence, but Murray had no “direct information” that Waters had ever seen the victim with a firearm. Id. In response to Murray’s argument, the Commonwealth countered that “the only way it [evidence that the victim previously possessed or used a firearm] would be admissible is if Mr. Murray knew that and had information to that. And it has nothing to do with Mr. Waters.” Transcript, Vol. V, at 116.
The issue of whether the victim or Murray was the first aggressor was therefore not before the jury. Although Murray also sought an instruction on reasonable provocation, defense counsel admitted that the presence of reasonable provocation was “a close call,” and he based his request solely on Murray’s having heard what he believed to be a call to arms of the victim and his cohorts on Kendall Street.[18] This argument, along with evidence that the victim possessed and/or previously used a firearm, was consistent with the defense’s focus on Murray’s state of mind — i.e., whether he was reasonably apprehensive for his safety.
Defense counsel even argued in his closing that the victim was bigger than Murray and that the victim “got right up in his face. And [Murray] started to back up. These guys are coming. He hears these words [about retrieving guns]. Is it unreasonable to think that he had to act then to defend himself when he had heard earlier in the day that the guy was going to rob him? Interpreting that a gun is going to be fired, he shoots and runs.” Transcript, Vol. IX, at 26. Again, the argument was focused on Murray’s state of mind and did not raise the issue of which individual was the first aggressor.
Murray’s requests for evidence of the victim’s prior acts of violence were therefore focused on the first theoiy for which such evidence is relevant i.e., a defendant’s reasonable apprehension for his safety, not the second theory with which Adjutant, 443 Mass. at 654, was concerned. See Benoit, 452 Mass. at 228. As a result, Murray is not eligible for a new trial on the basis of retroactive application of the new rule of evidence set forth in Adjutant. See id.
The added wrinkle in this case, however, is Murray’s argument that the Commonwealth failed to disclose to Murray the exculpatoiy evidence contained within the Slatteiy Affidavit. The implication is that, without this nondisclosed evidence, Murray was unable to challenge the identify of the first aggressor. If Murray can demonstrate this violation of his constitutional rights, and if Murray could not have made a first aggressor argument without this evidence, retroactive application of Adjutant in a new trial will ensure that justice is done. Mass.R.Crim.P. 30(b).
B. Constitutional Violation
“Due process requires that ‘the government disclose to a criminal defendant favorable evidence in its possession that could materially aid the defense against the pending charges.’ ” Commonwealth v. Clemente, 452 Mass. 295, 311 (2008), quoting Commonwealth v. Daniels, 445 Mass. 392, 401 (2005). This duly extends “to ‘information in the possession of the prosecutor and information in the possession of persons ’’sufficiently subject to the prosecutor’s control!,]" ’ “ id., quoting Commonwealth v. Beal, 429 *378 Mass. 530, 531 (1999), such as ’’others acting on the government’s behalf in the case, including the police" “who participated in the investigation and presentation of the case.” Commonwealth v. Lykus, 451 Mass. 310, 327 (2008), quoting Beal, 429 Mass. at 531, and Commonwealth v. Tucceri, 412 Mass. 401, 407 (1992); Commonwealth v. St. Germain, 381 Mass. 256, 261 n.8 (1980) (including within description of participating police those “who either regularly report or with reference to the particular case have reported to [prosecutor’s] office” (citation omitted)); see, e.g., Commonwealth v. Gallarelli, 399 Mass. 17, 20 n.4 (1987) (“[A]s a matter of law, the laboratory report was within [Commonwealth’s] custody and control, even though no copy was ever in the prosecutor’s files, and he himself was not aware that it existed”).
As early as 2001, Slattery knew that KST was a gang and that it was responsible “for a disproportionate share of drug trafficking and gang violence in Framing-ham.” Slattery interviewed Murray with Mahoney the day after the October 2003 shooting, thus he “participated in the investigation” of the victim’s death. This participation triggered the Commonwealth’s duty to “learn of any favorable evidence known to” Slattery. Beal, 429 Mass. at 531, quoting Kyles v. Whitley, 514 U.S. 419, 437 (1995).
1. Exculpatory
“The first step in assessing [Murray’s] claim is to determine whether the requested evidence is, in fact, exculpatory.” Commonwealth v. Bly, 448 Mass. 473, 485 (2007). Evidence is exculpatory if it “tends ‘to negate the guilt of the accused’ ... or stated affirmatively, ‘support! ] the innocence of the defendant.’ ” Id. (ellipses and alteration in original), quoting Commonwealth v. Healy, 438 Mass. 672, 679 (2003). Exculpatory evidence also includes favorable evidence “that is of significant aid to [the defendant’s] case, ‘whether it furnishes corroboration of the defendant’s story, calls into question a material, although not indispensable, element of the prosecution’s version of the events, or challenges the credibilify of a key prosecution witness.’ ” Id., quoting Commonwealth v. Ellison, 376 Mass. 1, 22 (1978); Daniels, 445 Mass. at 401 (“ ‘Favorable evidence’ need not be dispositive-evidence”). Murray argues that the non-disclosed evidence was exculpatory as it supported Murray’s version of events, and as it supported the impeachment of the Commonwealth’s witnesses.
a.Murray’s Version
Murray’s theory at trial was that Murray feared for his life on Kendall Street when he encountered the victim and his friends, and not merely because he feared the victim wanted to rob him. He attempted to support this theory with the argument that the victim and his friends were members of a violent gang. The Slattery Affidavit describes KST as a gang responsible for most of the drug trafficking and violence in Fra-mingham, names Salvi as a founding member, and notes that KST built a shrine for the victim at the scene of his murder.
As discussed above, a defendant may offer evidence of a victim’s violent character — here, gang affiliation— to demonstrate “the defendant’s state of mind (the subjective reasonableness of his apprehension and actions) . . .” Adjutant, 443 Mass. at 654; cf. Commonwealth v. Maldonado, 429 Mass. 502, 504 (1999) (holding defendant’s own gang affiliation “was relevant to the defendant’s motive and state of mind”). “[A] predicate” to the admission of this evidence, however, “is the defendant’s prior knowledge of it.” Adjutant, 443 Mass. at 654. Based on statements made at trial, defense counsel clearly knew of the existence of KST; it follows, then, that Murray himself knew as well. That purported knowledge notwithstanding, Murray will have to establish that he possessed this knowledge at the time of the shooting in order to admit evidence concerning the victim’s KST affiliation. See id.
This evidence is therefore potentially exculpatory on this basis.
b.Impeachment by Contradiction
The Slattery Affidavit indicates that, as of 2001, Slattery was aware that KST was responsible for drug trafficking and gang violence in Framingham, and that, as of2004, an investigation into KSTs criminal activities had commenced. This knowledge contradicts the testimony of Campbell, Waters, Bonner, and Lopez, all of whom stated that KST was not a gang, but merely a group of friends who grew up together.[19] Although “[ejxtrinsic evidence to rebut a witness on a collateral matter is not admissible as of right[,]” Commonwealth v. Zezima, 365 Mass. 238, 242 n.5 (1974), “[a] judge, in his discretion, may permit impeachment by extrinsic evidence on collateral matters.” Commonwealth v. Ferguson, 425 Mass. 349, 355 (1997). Thus, even if KSTs status as a Framingham gang and the affiliation of the victim and his cohorts with KST are collateral to the issue of Murray’s guilt or innocence, it would have been within the trial judge’s discretion to admit this evidence to enable Murray to impeach those Commonwealth witnesses at trial. Therefore the evidence is potentially exculpatory on this basis. See, e.g., Bly, 448 Mass. at 485 (holding evidence was exculpatory because, if defendant had reviewed such evidence, it “could have formed a valid means of impeachment of’ Commonwealth’s witness and DNA testing results).
c.Impeachment by Bias
“It is long and well established that evidence tending to show a witness’s bias, prejudice, or motive to lie is so significant that it is not considered a mere collateral matter but is deemed exculpatory evidence . . .” Commonwealth v. O’Neil, 51 Mass.App.Ct. 170, 178 (2001), and cases cited; see Commonwealth v. LaVelle, 414 Mass. 146, 153 (1993) (“[EJvidence of bias is almost never a collateral matter”). “A criminal defendant has the constitutional right to cross-examine a prosecution witness to show bias” and “the judge has *379 no discretion to bar all inquiry into” this bias even if the possibility of bias is remote. Commonwealth v. Noeun Sok, 439 Mass. 428, 435 (2003), quoting Commonwealth v. Tam Bui, 419 Mass. 392, 400, cert. denied, 516 U.S. 861 (1995). “[T]his evidence maybe introduced by reasonable cross-examination as well as extrinsic evidence.” Commonwealth v. Aguiar, 400 Mass. 508, 513-14 (1987).
“Whether evidence demonstrates bias, however, falls within the discretion of the trial judge.” Commonwealth v. Ellis, 432 Mass. 746, 754 (2000). Witnesses’ gang affiliation may serve as evidence “that the witnesses may have been inclined to protect themselves and their gang allies .. .” Noeun Sok, 439 Mass. at 435. Here, the Slattery Affidavit notes that KST members “rarely cooperate with police” even when they are the victims.[20] See Commonwealth v. Kenney, 437 Mass. 141, 154 (2002) (“Because evidence concerning motive to lie bears on credibility, it is admissible as a matter of right, provided there is some basis for the inquiry”); Tam Bui, 419 Mass. at 401 (“A defendant who seeks to pursue a subject in an attempt to demonstrate bias must make a plausible showing that the circumstances existed on which the alleged bias is based”). Evidence concerning KST is accordingly potentially exculpatory on the issue of the bias of the Commonwealth’s witnesses.
2. Effect of Nondisclosure
“Having determined that the evidence sought was potentially exculpatory, [the court’s] next step is to determine whether the nondisclosure of such evidence constitutes a due process violation.” Bly, 448 Mass. at 485-86. “If the defendant has expressly requested the specific evidence, a showing of a substantial basis for concluding that the defendant has been prejudiced by nondisclosure requires the granting of a new trial.” Commonwealth v. Miozza, 67 Mass.App.Ct. 567, 574 (2006), citing Tucceri, 412 Mass. at 412. “If the defendant has not made a specific request, a new trial is granted only if it is found that there is a ‘substantial risk that the jury would have reached a different conclusion if the evidence had been admitted at trial.’ ” Id., quoting Tucceri, 412 Mass. at 413. Murray did not make a sp ecific request for the evidence he argues the Commonwealth failed to disclose,[21] thus the latter standard applies to this analysis.[22] Id.; see Commonwealth v. Laguer, 448 Mass. 585, 595 n.27 (2007) (noting that “Commonwealth has a duty to disclose all exculpatory evidence, requested or not[;]... the existence of a specific request only affects the standard of review” (internal citation omitted)).
The Slattery Affidavit’s description of KST’s presence in Framingham as a gang responsible for “a disproportionate share of the drug trafficking and gang violence in Framingham!,]” its naming of two witnesses to the victim’s shooting as KST members, and its mention of the shrine KST erected at the scene of the victim’s murder bolster Murray’s theory of the case, contradict the testimony of certain of the Commonwealth’s witnesses, and demonstrate their motive to lie. Consequently, there is a substantial risk that, if the jury had heard the evidence concerning KST, it would have affected their deliberations such that they would have reached a different conclusion. See Commonwealth v. Grace, 397 Mass. 303, 306 (1986) (“The motion judge decides not whether the verdict would have been different, but rather whether the new evidence would probably have been a real factor in the jury’s deliberations”). Murray is thus entitled to a new trial on this basis.[23]
C. Conclusion
Murray had a due process right to the disclosure of the exculpatory gang-related evidence known to participating police. The undisclosed evidence would have materially aided Murray’s defense, and as a consequence, he is entitled to a new trial.
The absence of this evidence affected Murray’s ability to contest the identity of the first aggressor. At his new trial, Murray will be able to take advantage of the new common-law rule of evidence articulated in Adjutant, assuming he is able to make a showing that the victim and his cohorts,[24] and not Murray himself, were the first aggressors. See Adjutant 443 Mass. at 665-65 (“A defendant who intends to introduce evidence of the victim’s specific acts of violence to support a claim that the victim was the first aggressor must provide notice to the court and the Commonwealth of such intent and of the specific evidence he intends to ojjef' (emphasis added)).
ORDER
As a result of Eric Murray’s due process right to the disclosure of exculpatory evidence, his motion for new trial is ALLOWED.

 In an order dated January 19, 2005, this court granted immunily to Lopez on the grounds that Lopez would refuse to answer questions because the testimony might incriminate him for the offense of accessory after the fact of murder. Lopez testified for the Commonwealth under this grant of immunity.

 The first page of each of the transcripts has a typed volume number and a handwritten volume number that do not correspond. The typed volume number is used for the citations.

 Jones described the scene as Murray putting his hands on the front of the victim’s pants and the victim putting his hands on Murray’s wrists. Lopez testified that Murray had his hands on the victim’s pants near his pockets, and the victim pushed Murray’s hands off of him.

 Jones testified that the victim waved his hands; Campbell testified that the victim opened his arms to the sides, then out in front of him, with his hands open; Waters testified that the victim threw up his hands with his fists closed “[i]n a fight position!,]” Transcript, Vol. V, at 99; Lopez testified that the victim had his arms to the side with his hands open, and then he had his hands fisted in front of him as he walked towards Murray.

 Jones heard four or five gunshots; Campbell heard three or four; Waters heard “about three!,]” Transcript, Vol. V, at 99; Perez heard “about five or six[,]” Transcript, Vol. VI, at 11; Lopez heard “[l]ike three.” Transcript, Vol. VI, at 139.

 The victim sustained a gunshot wound to the wrist which, n the medical examiner’s opinion, was not fatal; the bullet that entered the victim’s chest and lodged in his aorta was a fatal wound, in the medical examiner’s opinion; the bullet that entered the victim’s back lodged in his abdomen, and, in the medical examiner’s opinion, was “treatable.” Transcript, Vol. VIII, at 91. Therefore, in the medical examiner’s opinion, the victim ”[m]ost likely” died from the gunshot wound to his chest. Id. The medical examiner who testified at trial was not the doctor who performed the examination.

 The previous night, after the shooting, Perez drove Jones and Pervis to Tommy’s Taxi where the police found the two men. From their interviews of Jones and Pervis, the police learned that Murray and Lopez had been involved in the shooting and that they were driving a gray or silver Ford Taurus with New Jersey plates.

 The police recovered three shell casings from the scene in the hours after the shooting, and recovered the fourth shell casing from the scene about two weeks later.

 The court sustained the Commonwealth’s objection to defense counsel’s question to Hers, ”[W]hat is the gang activity like in Framingham in terms of gangs?” Transcript, Vol. V, at 71.

 At trial, Mahoney testified to this effect as well, that he offered Murray a telephone call, and Murray “indicated he wanted to get everything taken care of, and then he would use the telephone." Transcript, Vol. VII, at 97.

 The jury asked their question on the first day of their deliberations, but the court answered it on the second day (which was the first full day) of deliberations.

 In its opposition to Murray’s motion for a new trial, the Commonwealth states that it does not challenge the veracity of Slattery’s representations in his affidavit.

 More accurately, the affidavit indicates that Slattery signed it on June 21, 2006. As the affidavit refers to indictments returned in June 2007, the 2006 is likely a typographical error.

 Theyear of these arrests is not given. This article is dated April 2008; the Slattery Affidavit is dated June 2007, see supra n. 13, and refers to KST defendants already in custody.

 In its rulings on Murray’s motion to suppress, this court (Brassard, J.) found that, when the police handcuffed Murray before transporting him to the police station, he was “not free to leave at this point and for all practical purposes had been arrested.” Hearing Transcript, May 21, 2004, at 5. This finding was clearly relevant to determining whether Miranda warnings were necessary. “Miranda warnings are only necessary where one is subject to ‘custodial interrogation.’ ” Commonwealth v. Morse, 427 Mass. 117, 122 (1998). “ To find custodial interrogation’ ” the court must determine whether there was (1) questioning or its functional equivalent and (2) “ ‘a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. . .’ ” Id. at 123 (citation omitted). This court did not find there was a formal arrest at the time the police handcuffed Murray, just that he was not free to leave and entitled to Miranda warnings. Therefore, as Murray’s telephone right depends on the timing of Murray’s formal arrest, the court’s previous finding does not affect this conclusion. See Dagley, 442 Mass. 719.

 Murray also argues that he is entitled to a new trial because the admission of the improperly withheld evidence (i.e., the victim’s prior violent acts and information concerning KST) would have required these instructions as well. As discussed further below, this court has allowed Murray’s motion for new trial on different grounds, thus the court will resolve all issues concerning jury instructions as they arise in Murray’s new trial.

 The Supreme Judicial Court issued its Adjutant decision on March 14, 2005. According to the Superior Court docket, Murray filed his notice of appeal with this court on February 1, 2005. Commonwealth v. Murray, Crim. No. 03-1756 (Middlesex Super.Ct.), Paper No. 69. The Supreme Judicial Court docket, however, shows an entry date of August 7, 2006. Commonwealth v. Murray, SJC-09798; see Commonwealth v. Murray, Crim. No. 03-1756 (Middlesex Super.Ct.), Paper No. 84 (Notice of Entry from Supreme Judicial Court, notifying Superior Court that case “was entered on the docket of this [CJourt” on August 7, 2006). Murray’s case was therefore not pending on direct appeal as of March 2005. It does not have to have been, however, to benefit from Adjutant In Pring-Wil-son, the defendant was eligible to benefit from Adjutant because the Court released Adjutant “[ajfter the defendant was convicted and sentenced, but before his appeal— . . . thus before his conviction became final . . .” 448 Mass. at 735-36 (emphasis added). Murray’s conviction was not final as of Adjutant’s issuance.

 Murray also sought an instruction on the victim’s reputation, which the court denied. Reputation evidence “does not qualify as Adjutant evidence.” Commonwealth v. Peppicelli, 70 Mass.App.Ct. 87, 99 (2007) (emphasis in original).

 The Slattery Affidavit and the 2008 article both state that “KST’ stood for either Kendall Street Thugs or Kendall Street Team, therefore Murray cannot rely on the Slattery Affidavit for his argument that the Commonwealth erred by not correcting witnesses who claimed that the ‘T” in KST stood for something other than “Thugs.”

 Notably, the Slattery Affidavit points to the victim’s brother’s 2005 shooting as an example of KST members’ unwillingness to cooperate with police.

 In February 2004, Murray filed his sole motion for discovery in this case, requesting, in pertinent part, “(a) copy of all police reports, including without limitation, reports of the investigating officers from the Massachusetts State Police that were assigned to the case herein.” In its July 2004 response, the Commonwealth stated that it had “forwarded all police reports in its custody and control. It is not aware of any outstanding reports at the time of this filing. If any other reports are generated or become known to the Commonwealth, they will be forwarded immediately.” This request does not encompass materials related to the investigation of KST that commenced sometime in 2004.

 The court disagrees with Murray’s argument that, because the Commonwealth would not have disclosed the evidence even if he had made a specific request, he is entitled to the standard of review that is “more favorable to the defendant . . .” Tucceri, 412 Mass. at 407. This disagreement, however, is of no consequence given the court’s ultimate conclusion that Murray is entitled to relief under the less favorable standard.

 Although Murray points to the Commonwealth’s statements that it was not “aware” of reputation evidence or prior violent acts concerning the victim and that the victim was not a “big bad gang member!,]” Murray does not argue, and there is no evidence, that the Commonwealth intentionally failed to disclose information concerning KST that Slatteiy attests to in his affidavit. See, e.g., Commonwealth v. Merry, 453 Mass. 653, 664-65 (2009) (“Had the prosecutor deliberately failed to disclose what he understood to be exculpatory evidence, or intentionally misled the jury by making statements in his closing argument that he knew were false, his conduct might have been grounds for dismissal [of the complaint]”).

 In Pring-Wilson, the Court extended Adjutant to permit the admission of “evidence of prior acts of violent conduct of a victim’s cohort.” 448 Mass. at 737. “Before admitting evidence of specific examples of a third parly’s violent acts, the judge should determine whether, in the light most favorable to the defendant, the third party was acting in concert with or to assist the victim.” Id. (emphasis added).