Commonwealth *vs.* Michael E. Benson.

Plymouth. October 10, 2008. - January 16, 2009.

Present: Marshall, C.J., Greaney, Cowin, Cordy, & Botsford, JJ.[1]

*Homicide. Practice, Criminal,* Instructions to jury, New trial, Capital case.

A criminal defendant convicted of murder in the first degree on theories of
deliberate premeditation and extreme atrocity or cruelty failed to demonstrate
that he was entitled to a new trial due to the trial judge's failure to instruct
the jury on voluntary manslaughter based on reasonable provocation induced
by the victim's stalking of the defendant for the four weeks preceding the
slaying, where neither the evidence presented at trial (which supported the
view that the defendant's resulting distress and fear did not precipitate a
moment so emotional that his capacity for self-control was overborne and
he then killed the victim in a moment of passion) [94-99] nor that submit-
ted in support of the new trial motion (which raised no substantial issue on
the question of provocation) supported such an instruction [99-100].

Indictment found and returned in the Superior Court Depart-
ment on September 20, 2002.

The case was tried before *Linda E. Giles,* J., and a motion for
a new trial, filed on June 6, 2007, was considered by her.

*Myles D. Jacobson* for the defendant.

*Robert C. Thompson,* Assistant District Attorney, for the
Commonwealth.

Botsford, J. Following a trial before a jury, the defendant
was convicted of murder in the first degree of Leon Weymouth
on theories of deliberate premeditation and extreme atrocity or
cruelty. He appeals from his conviction and from the denial of
his motion for a new trial, arguing that he was entitled to an in-
struction on voluntary manslaughter based on reasonable provo-
cation induced by the victim's stalking him for the previous
four weeks or so. We conclude that neither the evidence presented
at trial nor that submitted in support of the new trial motion

---

[1]Justice Greaney participated in the deliberation on this case prior to his
retirement.

supported a manslaughter instruction in this case. Accordingly, we affirm the defendant's conviction and the denial of his motion for a new trial. On further review of the entire case, we decline to exercise our authority under G. L. c. 278, § 33E, to grant the defendant a new trial.

1. *Background.* To determine whether a jury instruction on manslaughter based on reasonable provocation was warranted, we consider the evidence viewed in the light most favorable to the defendant. *Commonwealth* v. *Acevedo*, 446 Mass. 435, 442-443 (2006). We therefore summarize the facts relevant to this issue in that light.

It is undisputed that the defendant killed the victim, Leon Weymouth, on June 23, 2002. On that day, the defendant drove to where Weymouth was living, saw Weymouth standing outside in his front yard, and shot him four times with a shotgun loaded with "buckshot."

At the time of his death, Weymouth had been married to Monica Hagen (Hagen) for approximately one year. Hagen and the defendant had dated at one point some years before her marriage, and thereafter remained friends. They became more than friends when Hagen began to have marital problems with Weymouth. One month before the shooting incident, on or about May 23, 2002, Hagen asked the defendant to come over to the house where she lived with the victim. He did so and while at the home, he noticed that Hagen had a black eye and appeared to have recently been beaten. While the two were having coffee, Weymouth kicked in the door and began screaming in the defendant's face, threatening to kill Hagen, Hagen's family, and the defendant. The defendant feared for his life because he knew that Weymouth was "a black-belt in karate" and believed that he had had "many run-ins with people." When Hagen tried to contact the police, Weymouth pulled the telephone out of the wall. Hagen then went into the bedroom, which had a second telephone, and Weymouth left.

Not long after the May 23 incident, Hagen began to keep her pets at the defendant's house and took steps to sell her home. At some point in late May or June, Hagen moved into the defendant's trailer with him and stayed there most nights. On at least three occasions, Hagen's dog, along with the defendant's dog,

started barking loudly in the night. On one such occasion, the defendant went outside to investigate and saw what he believed to be someone leaving his property in what he recognized as Weymouth's Ford Bronco vehicle. The defendant concluded that Weymouth was stalking him and Hagen.

During the period from approximately May 23 to June 23, 2002, the defendant received a number of telephone calls at his trailer that he believed were from Weymouth, based on the sound of the caller's voice and the content of the calls.[2] The calls made the defendant "[v]ery, very uncomfortable." A few days before the June 23 shooting incident, the defendant stopped at a gasoline station to get gasoline for his car. As he was leaving, Weymouth appeared at his car window and began screaming in the defendant's face that the defendant should stay away from Hagen, that Weymouth was going to kill the defendant, and that "[b]lood [was] going to flow." When asked why he did not get his gun and kill Weymouth directly after this incident, the defendant testified, "It wasn't eating me up as bad at that time."

The defendant did not report any of these incidents to the police. He did complain to Hagen's father, Ovin Hagen, about the telephone calls and the presence of someone on or near his property. The defendant also complained about the dog barking incidents to his neighbors.

On June 23, the defendant left work at about 12:30 P.M. and, after stopping by Ovin Hagen's home briefly, returned to his trailer. Hagen was at the defendant's trailer when he arrived. The two proceeded to share three bottles of champagne and the defendant ingested some cocaine. Sometime in the midafternoon, the defendant and Hagen went to a restaurant where the defendant drank four or five beers and took three Percocet pills. At approximately 4:30 P.M. the defendant and Hagen returned to his trailer. Weymouth was on the defendant's mind that day: "[A]ll that day it was eating me up, eating me up, all the threats and what he was doing to [Hagen]."

At some point that afternoon, when Hagen went outside to feed the animals, the defendant located the key to his gun safe,

---

[2]The record does not indicate the exact number of telephone calls the defendant received or the dates on which they were received.

unlocked the safe, and took out his twelve-gauge shotgun. While he was retrieving his gun, the defendant had "a lot of hate in [his] mind" and he was in fear for his life because of "all the threats, him stalking me, him stalking [Hagen]." Nonetheless, the defendant agreed that his retrieval of the gun was a deliberate act. The defendant loaded the gun with five shells containing buckshot and he believed that if he pointed the gun at someone and pulled the trigger, the person would be killed. He then went outside to put the gun into his Jeep vehicle, returned to the trailer, and told Hagen that he had "to go somewhere."

The defendant drove from his trailer, located in the town of Buzzard's Bay, to Weymouth's house, which was in another town, East Wareham. At that point, he was "thinking about scaring [Weymouth] more than anything." On his drive, the defendant made a decision that if Weymouth were inside his home, the defendant would just drive by and not go in, out of fear that Weymouth would shoot him if he did so. When the defendant pulled into Weymouth's driveway, however, he saw Weymouth standing in his front yard, barefoot and unarmed, talking to a neighbor. The defendant got out of his Jeep with his gun. At that point the defendant intended to shoot Weymouth, because he was "sick of [Weymouth] threatening me all the time" and because "I knew if I didn't do something, he was going to kill me." The defendant said to Weymouth, "I've got something for you, Leon," and shot Weymouth in the chest from a distance of approximately twenty to twenty-five feet. Weymouth fell to his knees and the defendant yelled at the neighbor to leave. After moving closer, the defendant shot Weymouth three more times. After the fourth shot, the defendant walked back to his Jeep, put the shotgun in it, and drove to the house of Hagen's brother. When he arrived, he asked for a beer and said it would be the last beer he would be able to have for a long time. The defendant admitted to Hagen's brother that he had killed Weymouth and agreed that the police should be contacted. The defendant surrendered peacefully when the police arrived. An autopsy of Weymouth revealed forty-seven entrance wounds and twenty-one exit wounds. Eighteen buckshot pellets were recovered from the victim's body, thirteen from his chest. Weymouth died from the multiple gunshot wounds.

On the day of the killing and after his arrest, the defendant

was advised of his Miranda rights and thereafter spoke to a State trooper while in custody. The defendant told him, "It's a long story. I don't want to get into it. But Leon [Weymouth] threatened to kill me a couple of days ago. I know he's been on my property in the last couple of days. I wanted to make sure he died before I died."

At the defendant's trial, following the close of evidence, the defendant's attorney asked the judge to include an instruction on manslaughter, based on a theory of excessive use of force in self-defense; the attorney did not request a manslaughter instruction based on reasonable provocation due to stalking. The judge stated that she did not think that the defendant was entitled to any instruction on manslaughter or self-defense and added, "upon reflection I see no mitigating factors or circumstances that would warrant any kind of manslaughter instruction in this case."[3]

Following his conviction, the defendant filed a motion for a new trial in this court, based in part on the grounds that the defendant was a victim of stalking and that he was entitled to an instruction on voluntary manslaughter based on reasonable provocation induced by stalking. The motion was remanded to the judge, who denied it without a hearing, explaining her reasons in a comprehensive memorandum of decision.

2. *Discussion.* In appealing from his conviction and the denial of his motion for a new trial, the defendant raises a single issue: that he was entitled to an instruction on manslaughter, based on the theory of reasonable provocation.[4] We consider this issue first in relation to the trial, and second in connection with the new trial motion.

a. *The trial.* "A manslaughter instruction must be given if any view of the evidence would permit a verdict of manslaughter

---

[3]The judge, however, did instruct the jury that they might consider evidence of mental impairment or intoxication on the issue of the defendant's intent, and specifically on questions of intent to kill with deliberate premeditation and whether the defendant acted with extreme atrocity or cruelty.

[4]The defendant did request a manslaughter instruction based on the excessive use of force in self-defense, but not based on a theory of reasonable provocation, although the judge appeared to consider, and reject, the possibility of a reasonable provocation instruction. We need not decide whether the defendant's claim of error was preserved, because we conclude there was no error.

rather than murder . . . ." *Commonwealth* v. *Colon*, 449 Mass. 207, 220 (2007), citing *Commonwealth* v. *Brooks*, 422 Mass. 574, 578 (1996). The judge may not, however, "charge on a hypothesis not supported by the evidence." *Commonwealth* v. *Colon, supra*, quoting *Commonwealth* v. *Vanderpool*, 367 Mass. 743, 746 (1975). "A killing is manslaughter if there is 'provocation deemed adequate in law to cause the accused to lose his self-control in the heat of passion, and if the killing followed the provocation before sufficient time had elapsed for the accused's temper to cool.' " *Commonwealth* v. *Vinton*, 432 Mass. 180, 189 (2000), quoting *Commonwealth* v. *LeClair*, 429 Mass. 313, 316 (1999). A manslaughter instruction based on reasonable provocation is not appropriate unless there is evidence that, when considered in the light most favorable to the defendant, is "sufficient to create a reasonable doubt in the minds of a rational jury that a defendant's actions were both objectively and subjectively reasonable. That is, the jury must be able to infer that a reasonable person would have become sufficiently provoked and would not have 'cooled off' by the time of the homicide, and that in fact a defendant was provoked and did not cool off." *Commonwealth* v. *Zagrodny*, 443 Mass. 93, 106 (2004), quoting *Commonwealth* v. *Groome*, 435 Mass. 201, 220 (2001). See *Commonwealth* v. *Brum*, 441 Mass. 199, 205-206 (2004) (no manslaughter instruction required where no evidence present "that makes a theory of reasonable provocation or sudden combat tenable").

The question whether there is provocation sufficient to warrant a manslaughter instruction depends on a number of critical timing issues. First, provocation occurs only when an action of the victim triggers a *sudden* loss of self-control in the defendant. *Commonwealth* v. *McLeod*, 394 Mass. 727, 738, cert. denied sub nom. *Aiello* v. *Massachusetts*, 474 U.S. 919 (1985) (defining provocation in part as "sudden transport of passion or heat of blood"). Second, in cases in which the victim's last overt act is preceded by other similar or related acts, it is the last act that is significant: "We consider only whether the incidents immediately preceding the killing constituted reasonable provocation. Any history of prior hostilities between the victim and the defendant can only be viewed as a cause of the incidents preced-

ing the killing and not as an element of the provocation." *Commonwealth* v. *Amaral*, 389 Mass. 184, 188 (1983). See *Commonwealth* v. *Colon*, 449 Mass. at 222 ("Only incidents immediately preceding the shooting can constitute reasonable provocation"); *Commonwealth* v. *Amaral, supra* at 189, quoting *Commonwealth* v. *Bermudez*, 370 Mass. 438, 442 (1976) ("Without evidence of a threat of 'immediate and intense offense' . . . instructions on manslaughter would not be appropriate"). Third, for there to be provocation, the killing must occur before there is sufficient time for the defendant to cool off. *Commonwealth* v. *Zagrodny*, 443 Mass. at 106. *Commonwealth* v. *Schnopps*, 383 Mass. 178, 180 (1981), *S.C.*, 390 Mass. 722 (1984).

The defendant argues that if the common law on reasonable provocation is viewed in conjunction with G. L. c. 265, § 43 (*a*), the statute defining the crime of stalking, the defendant was entitled to a manslaughter instruction based on reasonable provocation. General Laws c. 265, § 43 (*a*), provides:

> "Whoever (1) willfully and maliciously engages in a knowing pattern of conduct or series of acts over a period of time directed at a specific person which seriously alarms or annoys that person and would cause a reasonable person to suffer substantial emotional distress, and (2) makes a threat with the intent to place the person in imminent fear of death or bodily injury, shall be guilty of the crime of stalking and shall be punished by imprisonment in the state prison for not more than five years or by a fine of not more than one thousand dollars, or imprisonment in the house of correction for not more than two and one-half years or both."

The defendant's contention is that the language of this statute, in combination with the severity of the penalty it provides, supports two claims: (1) Weymouth's words and conduct constituted reasonable provocation; and (2) because stalking involves by definition repeated acts or a pattern of acts by the stalker, causing substantial emotional distress that builds over time on the part of the person stalked, it was objectively reasonable for a stalked person in the defendant's circumstances not to have cooled off in the length of time between Weymouth's provocation and the killing.

Nothing in G. L. c. 265, § 43 (*a*), alters our conclusion that the evidence of provocation at the defendant's trial was insufficient to warrant a provocation instruction. On the assumption that Weymouth's conduct toward the defendant constituted stalking within the meaning of § 43 (*a*), the stalking statute implies only that stalking causes "substantial emotional distress" and "imminent fear of death or bodily injury," not the mental state required for provocation, i.e., a moment of heightened passion that overwhelms the capacity for self-control necessary to prevent deadly violence. There is no evidence in this record, expert or otherwise, that stalking causes a reasonable person to experience such a loss of self-control, and certainly no evidence that stalking causes a person to develop an impulse to kill.

This court has held that no manslaughter instruction is warranted when a defendant acts from a "smoldering" anger, as opposed to the requisite "sudden transport of passion." *Commonwealth* v. *Keohane*, 444 Mass. 563, 569 (2005). The record here contains nothing to suggest that the defendant ever experienced a moment of such sudden passion that his capacity for self-control was eclipsed. The last overt act of stalking occurred several days before the killing, when Weymouth approached the defendant at a gasoline station and threatened to kill him. The defendant experienced no loss of self-control at that time; he testified that he did not get his gun and kill Weymouth then because "[i]t wasn't eating me up as bad at that time." During the days between the gasoline station incident and the killing, the defendant testified to experiencing emotional distress and fear, but no moment of passion associated with a loss of self-restraint.

On the day of the killing, the defendant's actions were deliberate, not passionate. He unlocked a safe, retrieved a gun, loaded it with buckshot, drove to Weymouth's residence, and shot him four times. This sequence of events is incompatible with provocation. As this court stated in *Commonwealth* v. *Clemente*, 452 Mass. 295, 321 (2008), "[i]n . . . cases in which a provocation instruction has been warranted, the combat was unplanned and the defendant was often the one subject to the first physical attacks that escalated into mutual violence." We held there that no manslaughter instruction was warranted in light of the fact

that the defendant "armed himself in preparation for a fatal confrontation and, carrying a loaded weapon, went to a location where he knew he would find the victims." *Id.* While the defendant in that case "may have feared the victim[]," he nevertheless "sought [him] out" and was for that reason, among others, ineligible for a manslaughter instruction. *Id.* The same observations may be made about the defendant in this case.

The defendant argues that G. L. c. 265, § 43 (*a*), should prompt the court to revise the principle that a provocation instruction is warranted only if the killing occurs a short time after the provocation and before the defendant has an opportunity to cool down. The defendant suggests that stalking victims experience distress and fear both during particular stalking incidents and afterward, and that the full impact of a sequence of stalking incidents may not be felt immediately. As a result, he contends, "the last overt act and the reaction which culminates in a homicide may be longer than usual." Thus, while it may appear that a stalking victim who kills had ample time to cool down between the last stalking incident and the killing, in fact, the stalking victim may not yet have reached the boiling point for much of that period of time.

We do not need to reach the issue whether, in cases offering evidence that the defendant was a victim of stalking, we should recognize the possibility that the cooling off clock starts at a point that possibly may be quite distant from the last provocative act. Whether the defendant in this case ever "heated up," he was clearly "cool" during the time just prior to the killing, when he planned, prepared for, and executed his trip to Weymouth's house armed with a gun. See *Commonwealth* v. *Colon,* 449 Mass. at 221 (provocation instruction not warranted where defendant and victim were separated for at least a few minutes between provocation and killing, and defendant then sought out victim); *Commonwealth* v. *Keohane,* 444 Mass. at 568 (defendant had adequate time to cool down where he left scene of provocation and returned to attack victim).

The defendant in this case may have been a victim of stalking; the record certainly would warrant a jury's finding that he suffered emotional distress and fear as a result of Weymouth's conduct and words. Nevertheless, the evidence supports the

view that the defendant's distress and fear did not precipitate a moment so emotional that his capacity for self-control was overborne, and then he killed the victim in a moment of passion. As the trial judge noted, "this was a cold-blooded, preemptive attack, not the result of . . . [provoked] incitement." No provocation instruction was warranted.

c. *Motion for a new trial.* The defendant filed a motion for a new trial that focused on his claim that he was entitled to an instruction on reasonable provocation. The defendant supported his motion with the facts presented at trial in combination with facts contained in documents he submitted with his motion, including an affidavit from Hagen dated May 1, 2007; an abuse prevention order Hagen had obtained against Weymouth dated May 6, 2002, which was supported by separate affidavits of Hagen; and several journal articles on the effect of stalking on its victims. The defendant argues that based on these facts, a jury could have (1) inferred that there was evidence of objective and subjective provocation; (2) had reasonable doubt as to whether the defendant acted with malice; and (3) had reasonable doubt as to whether the defendant acted out of excessive use of force in self-defense, all justifying a manslaughter conviction. The defendant requested an evidentiary hearing, funds to retain an expert on the effects of stalking, a posthearing reduction of his conviction from murder in the first degree to manslaughter, or the granting of a motion for a new trial. The judge denied the motion without a hearing.[5]

"Whether an appeal is from the granting or the denial of a motion for a new trial, an appellate court will examine the motion judge's conclusion only to determine whether there has been a significant error of law or other abuse of discretion. . . . A reviewing court extends special deference to the action of a motion judge who was also the trial judge." *Commonwealth* v. *Grace,* 397 Mass. 303, 307 (1986). Where the motion for a new trial does not "raise a substantial issue," an evidentiary hearing is not required. *Commonwealth* v. *Britto,* 433 Mass. 596, 608 (2001).

---

[5]The judge did not address the defendant's request for expert witness funds in her decision denying the motion for a new trial, and the defendant does not argue any error in that regard. See note 6, *infra.*

The judge did not err in denying the motion for a new trial without holding a hearing because the defendant's motion did not raise a substantial issue. Hagen was not called as a witness at trial. The judge permissibly could discredit Hagen's supporting statements in her later affidavit concerning Weymouth's abuse of her and his alleged stalking, the defendant's statement to her that he feared that Weymouth was going to kill him, her witnessing of the victim's presence on the defendant's property "a week or so before the shooting," and her witnessing of an incident in which the dogs barked loudly at night. See *Commonwealth* v. *Goodreau*, 442 Mass. 341, 351 (2004). Furthermore, as the judge noted in her memorandum of decision and order denying the motion for a new trial, even if she had credited Hagen's statements, they were unavailing, in some instances because they were duplicative of facts presented at trial, and in others because they relied on inadmissible hearsay. See *id.* at 351 n.6. As the judge also concluded, the material the defendant submitted with his motion for a new trial did not fill crucial gaps in the trial record concerning whether the defendant was himself provoked by Weymouth's stalking, whether a reasonable person subject to stalking would lose the capacity for self-restraint and be prone to kill the stalker, and whether the defendant was, in the judge's words, "devoid of any ability to control his feelings" when he killed Weymouth. We have reviewed the record; it is clear that the trial judge neither erred nor abused her discretion in denying the defendant's motion for a new trial.[6] See *Commonwealth* v. *Britto*, 433 Mass. at 608 (judge's conclusion that defendant's motion and affidavit did not raise substantial issue entitled to substantial deference).

3. *Conclusion.* We have reviewed the entire record and find

[6]At the very end of his brief, the defendant states in a footnote that his position before this court is "that no mental health expert was needed in this case to support a manslaughter instruction," but that if the court were to conclude otherwise, the defendant would like an opportunity to submit such evidence as part of further review under G. L. c. 278, § 33E, or in support of a renewed motion for a new trial. Neither the record nor this single footnote sufficiently develops a claim about what role, if any, an expert witness might play in connection with the defendant's argument about reasonable provocation induced by stalking. See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975). We are not in a position to consider it.

no reason to exercise our authority under G. L. c. 278, § 33E, to reduce the defendant's conviction or order a new trial.

*Judgment affirmed.*

*Order denying motion for a new trial affirmed.*