# DECISIONS

## OF THE

## SUPREME JUDICIAL COURT

### OF

## MASSACHUSETTS

---

### COMMONWEALTH *vs.* LARRY NELSON.

Suffolk. January 10, 2014. - April 17, 2014.

Present: IRELAND, C.J., CORDY, BOTSFORD, GANTS, & DUFFLY, JJ.

*Homicide. Practice, Criminal,* Capital case, Argument by prosecutor, Instructions to jury, Question by jury. *Jury and Jurors.*

At a murder trial, no prejudicial error occurred in a remark that the prosecutor made in closing argument regarding an injury to the defendant's hand, where the remark was based on evidence and was a proper response to an argument raised by the defense [10-11]; likewise, no prejudicial error occurred in the prosecutor's argument that the victim would have felt the pain of his incised wounds, where, although the medical examiner did not specify the sequence of the wounds inflicted, she did not testify that death was immediate or instant, and the jury reasonably could have inferred that the victim was alive when some or all of the incised wounds had been inflicted [11]; further, no substantial likelihood of a miscarriage of justice arose from the prosecutor's argument that it would have been "mental torture" for the victim to have been so close to his front door without being able to reach it, where the

comment was a reasonable inference drawn from the evidence [11-12]; finally, no substantial likelihood of a miscarriage of justice or improper shifting of the burden of proof occurred in the prosecutor's asking in closing argument where the evidence was that the victim had a knife in his hands, given that, in the context of the entire argument, the question served not to comment directly on the defendant's silence but to undercut the defendant's claim that the wounds to his own hands were defensive [12-13].

At a murder trial, the defendant was not entitled to an instruction on voluntary manslaughter, where the evidence that the defendant reported to police that he had been attacked by a Hispanic male about thirty years of age would not permit a jury reasonably to infer that the victim (an African-American who was sixty-four years of age) was the attacker, and where, in any event, there was no evidence that the victim had provoked the defendant immediately before the victim had been stabbed, in that the claimed provocation occurred on a street while the victim was found in his apartment. [13-15]

At a criminal trial, the judge did not abuse her discretion in handling a question from the jury during deliberation, where the judge followed appropriate procedure by consulting with counsel, and where, correctly recognizing that the question involved a factual issue to which she was not authorized to speak, the judge nevertheless provided the jury with the relevant legal framework to resolve their question; further, there was no error in reinstructing the jury of their duty to find the defendant guilty of the most serious offense that the Commonwealth had proved beyond a reasonable doubt. [15-17]

INDICTMENT found and returned in the Superior Court Department on May 15, 2008.

The case was tried before *Judith Fabricant*, J.

*Leslie W. O'Brien* for the defendant.

*Teresa K. Anderson*, Assistant District Attorney (*Gretchen Lundgren*, Assistant District Attorney, with her) for the Commonwealth.

IRELAND, C.J. On January 26, 2010, a jury convicted the defendant, Larry Nelson, of murder in the first degree on a theory of extreme atrocity or cruelty. Represented by new counsel on appeal, the defendant argues error in the prosecutor's closing argument and in the judge's instructions to the jury. We affirm the defendant's conviction and discern no basis to exercise our authority pursuant to G. L. c. 278, § 33E.

1. *Background.* The jury could have found the following facts. On October 12, 2007, Boston police officers, responding to a telephone call made from a resident of the victim's apart-

ment building, discovered the victim's body inside his apartment. The victim's identity was not immediately ascertainable because his body was in a state of decomposition.[1] The victim's body was on the floor in the front hallway about five or six feet from the main entrance. He was on his left side with his head toward the front door. His shirt was soaked in blood. There was a pool of dried blood underneath him, gaping wounds to his neck and face, and reddish-brown stains on the walls of both sides of the hallway. Emergency medical technicians arrived and pronounced the victim dead. He was sixty-four years of age.

The victim had a total of twenty stab and incised wounds. He had six wounds to his head and neck, seven wounds to his torso area, and seven wounds on his upper extremities. The victim died as result of stab wounds to the head, neck, torso, and upper extremities, with perforations of the lung and subclavian artery, and associated hemorrhage. The medical examiner who conducted his autopsy expressed her opinion that the victim died within minutes from when his wounds were inflicted.

The victim and the defendant knew each other. They had met at the WAITT[2] house, a nonprofit organization in the Roxbury section of Boston that provides adult education. The defendant, who had graduated from the WAITT house, tutored the victim for some time. Because of some health issues, the victim, however, stopped attending classes.[3] The victim was last seen at the WAITT house on August 3, 2007.

On Sunday, October 7, 2007, in the early afternoon, the defendant went to the residence of a former girl friend, Leonice Depina, with whom he remained in close contact.[4] It was Depina's birthday and he told her that he would return later with some food. The defendant did not return. Depina telephoned him, but he did not answer.

At 6:45 P.M. on October 7, the defendant's friend and former

---

[1]Police identified the body as the victim's by means of his fingerprints.

[2]"WAITT" is an acronym for "we're all in this together."

[3]The victim had been blind in one eye since childhood. He had had open heart surgery in April, 2007. He used a cane to walk.

[4]Leonice Depina lived in Cambridge about three miles from a shopping complex known as "Twin City Plaza" in Somerville.

girl friend, Barbara Ywahu,[5] received a voice mail message on her cellular telephone from the defendant.[6] When Ywahu, who is a nurse, returned his telephone call, the defendant asked her to meet him at a subway station that was a couple of blocks from her home in the Jamaica Plain section of Boston. The defendant asked her to bring a needle and thread, some towels, and a shirt.

When Ywahu arrived, the defendant got out of her automobile,[7] and she saw that the defendant's right hand was wrapped in bloody rags. She observed that his hand had a "horrible cut." She asked him what had happened and he stated, "Somebody owed me some money." Although closer hospitals were nearby, the defendant asked that she drive him to Cambridge Hospital. The defendant changed his shirt and put the shirt that he had been wearing, along with the bloody rags that had been wrapped around his hand, into a plastic bag that he tossed into the back seat of the automobile. He moved a gym bag into the trunk of the automobile.

At the hospital, they parked and headed to the emergency room. The defendant instructed that, if anyone asked, Ywahu was to tell them that she had been shopping at the "Cambridge Galleria" and that he had telephoned her. He added that she should say she then picked him up on Cambridge Street.

When the defendant was being treated, a Cambridge police detective questioned Ywahu in a waiting room.[8] She told the detective that the defendant was her friend and (as the defendant had instructed) that he had been shopping at the "Cambridge Galleria" and telephoned her to come pick him up. Ywahu told the detective that someone had tried to rob the defendant, that he was bleeding, and that she picked him up and brought him to the hospital.

---

[5]Barbara Ywahu testified pursuant to a nonprosecution agreement made with the Suffolk County district attorney's office.

[6]After ending her romantic relationship with the defendant, Ywahu remained close to him. She allowed him to use her automobile and continued to pay the monthly bills for a cellular telephone that she had purchased for the defendant when they had been dating.

[7]See note 6, supra.

[8]A police officer explained that, "when a victim of a stabbing or a suspicious injury [goes to a hospital]," it is common practice for hospital staff to notify police of such an occurrence.

The defendant was transferred to Massachusetts General Hospital in Boston because he needed surgery. Ywahu followed him there. Cambridge police Detective John Boyle responded to the hospital at approximately 8:30 P.M. and spoke separately with Ywahu and the defendant. Ywahu told him the same story she had relayed to the detective in Cambridge. The defendant, however, gave a different story.

The defendant first stated that he had been coming out of a particular store in the "Twin City Plaza" when a light skinned Hispanic male in a dark hooded sweatshirt approached him, demanded money, and raised a knife. The defendant stated that he grabbed the knife and was hurt, and engaged in a struggle over the knife. The attacker fled when an automobile driving by beeped its horn. The defendant informed the detective that he did not believe his wound was serious, so he called his friend who was a nurse (Ywahu), who picked him up on Cambridge Street in Cambridge. The defendant gave Depina's address as his own.

When Detective Boyle relayed his intention to "pull" surveillance footage from the store, the defendant said he had been on a sidewalk in front of the store. When Detective Boyle stated that he would be calling the Somerville police department for them to investigate, the defendant recalled that he had been stabbed across the street from the "Twin City Plaza." As the conversation continued, the defendant changed the location of the alleged attack to a side street off of Cambridge Street. The defendant ended by stating that the attack had occurred in Somerville next to a brick apartment building. Detective Boyle photographed the defendant's injury, then searched near all the possible locations of the defendant's alleged attack and did not find any evidence of an attack. He concluded that the incident had not occurred in Cambridge and ended his investigation, passing on the information to the Somerville police department.

Before Ywahu left the hospital, the defendant instructed her to drive her automobile home, park it, and leave it in the driveway. The defendant told her not to look inside the gym bag that he had placed in the trunk. He asked her to discard the plastic bag with his bloody shirt and bloody rags in a Dumpster on her way home. The defendant headed into surgery at about midnight. Ywahu followed his instructions.

There was evidence that, on October 7, calls from the defendant's telephone were made at various times to the victim's telephone.[9] The defendant's telephone was used to call the victim at 12:22 P.M., 2:40 P.M., and 5:08 P.M. The calls, respectively, lasted approximately two minutes, three minutes, and two minutes in duration. At 5:37 P.M., the victim's telephone was used to contact the defendant, and the call lasted about six minutes. At 5:43 P.M., the defendant's telephone made another call to the victim's telephone that lasted about two minutes. At 6 P.M., the victim's telephone was used to call the defendant; this call lasted only seven seconds and went into the voice mail system of the defendant's telephone. After this time, all incoming telephone calls to the victim went into his voice mail system. The victim's telephone, however, was used at 6:45 P.M. to call the cellular telephone belonging to and used by Ywahu. The duration of that call was fifty-eight seconds. No further calls thereafter were made from the victim's telephone.

Video surveillance shows that the victim made a withdrawal from an automatic teller machine at a supermarket in the Roxbury section of Boston at 5:51 P.M. on October 7. The receipt for this transaction and the full amount of cash withdrawn, sixty dollars, were found in the pocket of the victim's pants by police.

On the morning of Monday, October 8, Somerville police Detective Ernest Nadile spoke with the defendant at the hospital. The defendant stated that he had been walking on Cambridge Street in Cambridge and that a Hispanic male with a black hooded sweatshirt stopped him asking for a cigarette. The man pulled out a knife, demanded his wallet, and went to stab him. The defendant put his right hand up to defend himself. The defendant stated that he then called his girl friend, Ywahu. He gave Detective Nadile Depina's address as his own.

That same day, the defendant telephoned Depina. He told her that, on the day before, he had visited the "Twin City Plaza" shopping center. There, someone asked him for a cigarette. When he unzipped his jacket to get one, the person stabbed him

---

[9]Cellular telephone records of the victim and Ywahu were introduced in evidence. Ywahu had her own cellular telephone and had purchased one in her name for the defendant's use (we refer to this cellular telephone as the defendant's telephone). See note 6, supra.

in his hand. The defendant informed Depina that he was in a hospital. The next day, Tuesday, October 9, Depina visited the defendant at Massachusetts General Hospital. He asked if he could stay with her after he was discharged,[10] and she agreed. Depina recalled that the defendant stayed with her for about one week.

Also on October 9, the defendant called his supervisor at the WAITT house. He stated that he was in the hospital and had been attacked in front of a shopping mall in Cambridge, the "Cambridge Galleria," and his hand had been seriously injured. The defendant subsequently returned to teach, but because of his injury, his supervisor encouraged him to seek disability benefits.

That same day, Ywahu, at home, cleaned off blood spots from her automobile. After opening the trunk, she looked inside the gym bag and saw a large knife covered in blood as well as two handguns. In the glove box compartment, she discovered the victim's wallet, a bottle of pills prescribed to the victim, and the victim's cellular telephone.

A couple of days later, the defendant was discharged and Ywahu went to pick him up. The defendant asked to take her automobile; Ywahu took public transportation home. She did not see the items she had found inside the automobile again.

Numerous items recovered from the victim's apartment were subjected to forensic testing. Among those items tested were stains on a letter, a jacket, a light pink towel from the victim's bedroom, and a pair of scissors from the bathroom, and stains in the hallway outside the bathroom and the hallway of a stairway outside the victim's apartment. The defendant was included as a possible source of deoxyribonucleic acid (DNA) collected from these stains. Statistically, the profile obtained from those items would occur in one in 53 quintillion African-American males.[11]

After obtaining the victim's telephone records, Boston police Detectives Jeremiah Benton and Tod Herron, on March 11, 2008, spoke with the defendant. Using a preprinted form, the detectives first read the Miranda warnings to the defendant, who indicated he understood and signed the form. The defendant

---

[10]The defendant was discharged on Friday, October 12.

[11]The defendant is African-American.

then agreed to have the interview electronically recorded and signed a consent form to that effect.

The defendant told the officers that he had known the victim for four years and had been his teacher at the WAITT house. The defendant telephoned the victim after his heart surgery to see how he was doing. The defendant also had given the victim a ride back to the victim's apartment. The defendant stated, however, that he had never been inside the victim's apartment. The last time the defendant recalled seeing the victim was in October outside a supermarket.

Concerning his hand injury, the defendant told the detectives that he had been out of work for some time because he had had an operation on his hand. He relayed that someone had tried to rob him in Cambridge on October 7. He stated that he had been at the "Twin City Mall" on Cambridge Street when someone asked him for a cigarette. The defendant recounted that he reached into his pocket, and then looked up to find the "kid" swinging a knife at his neck. The defendant said he put his hand up and was hit with the knife. The defendant agreed to provide a DNA sample and insisted that police would not find his DNA in the victim's apartment.

Later that day, the detectives spoke with Ywahu. They told her that she had received a call from a dead man's telephone and provided the victim's name. Ywahu lied and said she had never heard the name before. The detectives asked her whether she knew the defendant and what he was doing on October 7. She repeated what she had told the other police officers at the hospitals.

After the detectives left, Ywahu contacted the defendant, and they met. She asked the defendant what was going on, and he replied, "They're going to try to pin this on me. I can't go to jail." Ywahu told the defendant that the detectives had asked her whether she knew the victim. The defendant said, "Oh, just tell them you met him a couple of times." Ywahu said it was "too late for that."

Thereafter the defendant and Ywahu rented a room at a hotel in Boston for a couple of nights. The defendant went outside to smoke, believed he saw some police officers, and telephoned Ywahu to tell her that he was not returning to their room. Three

weeks later, the defendant telephoned her, telling her, "Everything's fine."

On April 30, 2008, Boston police officers executed a search warrant for Ywahu's automobile. Inside, they found a "group disability claim" form that included the defendant's "Accident Statement" where the defendant wrote:

> "On the evening of October 6, 2007, I (Larry Nelson) was walking down Cambridge Street[,] Cambridge. As I walked down Warren Street to Gore Street (Somerville/ Cambridge border[)], I was approached by a black male, approximately [five] feet [seven]. The perpetrator ask[ed] me for a cigarette. As I reached in my pocket to give him said cigarette, I then looked up towards him and he was swinging a large[,] shiny object at my neck. I then quickly backed up and simultaneously put up my right hand to block said object. Seconds later[,] the perpetrator ran in the opposite direction of Gore Street. I began to feel a burning sensation in my hand. I suddenly realized that I had been stabbed in my right hand. ([The] nerves [were] completely severed on [four] fingers[.]) As I attempted to stop the bleeding I called for help and when help arrived I was taken to Cambridge Hospital."

After the police received the DNA report concerning the testing done of items from the victim's apartment, they sought an arrest warrant for the defendant.

The defendant did not testify at trial. Through cross-examination of the prosecution witnesses, his defense counsel elicited evidence that there was no animosity or conflict between the defendant and the victim and that, in fact, they had been friends. In reviewing the forensic evidence in his closing argument, defense counsel argued that the defendant's blood was not found within twenty or twenty-five feet of the victim, and, if he had cut his hand stabbing the victim, then his blood should have been on the victim's clothing. Defense counsel asserted that the defendant's wounds to his hand were defensive wounds, suggesting that he was, in fact, attacked by someone with a knife. Defense counsel pointed out that the defendant had no motive to kill the victim. Last, he argued that Ywahu had testified falsely to curry favor with the prosecution.

2. *Prosecutor's closing argument.* The defendant argues that the prosecutor made a number of improper remarks in her closing argument. "Remarks made during closing arguments are considered in the context of the whole argument, the evidence admitted at trial, and the judge's instructions to the jury." *Commonwealth* v. *Whitman,* 453 Mass. 331, 343 (2009), citing *Commonwealth* v. *O'Connell,* 432 Mass. 657, 659 (2000). We note that, before closing arguments commenced, the judge instructed the jury that the closing arguments of counsel are not evidence, and she repeated this instruction in her final charge to the jury.

a. The defendant first contends that the prosecutor improperly stated that the injury to his hand was not a defensive wound because there was no evidence to support the argument and the medical examiner had testified that the injury might have been defensive. Because the defendant objected to the argument at trial, we review for prejudicial error. *Commonwealth* v. *Johnson,* 463 Mass. 95, 112 (2012). We conclude that there was none here.

During his closing argument, defense counsel suggested that the defendant's injuries to his hand were defensive wounds. At trial, during cross-examination of the medical examiner, defense counsel had elicited testimony that the injuries to the defendant's hand (as shown to the medical examiner through several photographs) were consistent with defensive wounds, but not necessarily defensive wounds. On redirect examination, the medical examiner explained that any wound on a person's hand could be a defensive wound and that there are other ways to cause the same type of wounds depicted by the photographs, including a hand sliding down a knife. Considered in the context of the medical examiner's testimony in its entirety, the challenged remark was based on evidence and was not improper. See *Commonwealth* v. *Colon,* 449 Mass. 207, 224, cert. denied, 552 U.S. 1079 (2007), quoting *Commonwealth* v. *Freeman,* 430 Mass. 111, 118 (1999) ("Arguments based on testimony submitted at trial . . . are proper . . ."); *Commonwealth* v. *Guy,* 441 Mass. 96, 110 (2004), citing *Commonwealth* v. *Stote,* 433 Mass. 19, 28 (2000), *S.C.,* 456 Mass. 213 (2010) ("Prosecutors must limit the scope of their closing arguments to facts in evidence and the fair inferences that may be drawn therefrom"). The remark was also a proper response to the argument raised by

the defense. See *Commonwealth* v. *Anderson*, 411 Mass. 279, 286 (1991).

b. The defendant asserts that the prosecutor's argument that the victim would have felt the pain of the eleven incised wounds, made when suggesting that the murder was committed with extreme atrocity or cruelty, was not supported by the evidence because the medical examiner could not specify the order in which the wounds were inflicted or whether the injuries from which death would follow quickly occurred first. The defendant objected to the prosecutor's assertion at trial, but we conclude that the evidence supported the challenged remark. Although the medical examiner could not specify the sequence of the wounds inflicted, she did not testify that death was immediate or instant; rather, she testified that death likely occurred within minutes. Thus, the jury reasonably could have inferred that the victim was alive when some or all of the incised wounds had been inflicted and consequently felt the pain from these wounds. These inferences are also supported by the testimony of a criminologist of the Boston police department's crime laboratory who had training in blood spatter analysis. She testified that the pattern of projected blood on the walls of the victim's apartment indicated that the victim's heart had been beating, thus suggesting that the victim was still alive, when certain wounds were inflicted. It is not improper for a prosecutor to make an argument presented by way of reasonable inferences that could be drawn from the evidence. See *Commonwealth* v. *Ruiz*, 442 Mass. 826, 835 (2004); *Commonwealth* v. *Hoffer*, 375 Mass. 369, 378 (1978). There was no error.

c. The defendant also argues that there was no evidence to support the prosecutor's remark that it would have been "mental torture" for the victim to have been so close to his front door "but not being able to reach it." Because the defendant did not object to this comment at trial, we "examine whether anything said by the prosecutor was improper and, if so, whether the impropriety created a substantial likelihood of a miscarriage of justice." *Commonwealth* v. *Frank*, 433 Mass. 185, 195 (2001), and cases cited. No substantial likelihood of a miscarriage of justice arose from the remark. The victim's body was found near the front door to his apartment, and as explained above,

the evidence permitted the jury to reasonably infer that he was alive when some or many of his wounds were inflicted. The comment was a reasonable inference drawn from the evidence.

d. We next address the defendant's argument that the prosecutor improperly shifted the burden of proof and commented on the defendant's silence by asking the jury, "[W]here is there any evidence of [the victim] ever, ever having had a knife in his hand?" "A prosecutor cannot comment on a defendant's failure to contradict testimony and cannot make statements that shift the burden of proof from the Commonwealth to the defendant." *Commonwealth* v. *Amirault*, 404 Mass. 221, 240 (1989). "A prosecutor is entitled to emphasize the strong points of the Commonwealth's case and the weaknesses of the defendant's case, even though he may, in so doing, prompt some collateral or passing reflection on the fact that the defendant declined to testify." *Commonwealth* v. *Feroli*, 407 Mass. 405, 409 (1990). "The question is whether the challenged remark, when viewed 'in the context of the entire argument,' is 'directed more at the general weakness of [the defendant's] defense than toward the defendant's own failure to testify.' " *Id.*, quoting *Commonwealth* v. *Storey*, 378 Mass. 312, 324 (1979), cert. denied, 446 U.S. 955 (1980).

Here, the rhetorical question must be examined in context:

> "Now, [defense counsel] has asked you, suggested to you that [the defendant's injuries to his hand are] consistent with a defensive wound. The problem is, ladies and gentlemen, where is there any evidence of [the victim] ever, ever having had a knife in his hand? There is none. And for [defense counsel] to suggest to you and to ask you to find that this is consistent with a defensive wound is asking you to engage in speculation. There is absolutely no evidence of [the victim] having any weapon in his hand, let alone a knife."

The problem that arises with the use of the rhetorical question is that it is not clear where this "evidence" would have come from other than from the defendant himself. No knife with fingerprints was recovered at the crime scene; no surveillance camera recorded the incident. Thus, use of the rhetorical

question arguably implied the unstated observation that the defendant did not testify that the victim used a knife to inflict the defendant's injuries. This indirect implication, however, dissipates when the question is examined in context. In so doing, it is apparent that the question served not to directly comment on the defendant's silence, but to undercut the defendant's claim that the wounds to his hands, however inflicted, were defensive. Further, any potential for harm was adequately cured by the judge's "clear, strong, and correct instructions on the presumption of innocence, the factors for . . . drawing inferences from the evidence, the Commonwealth's burden of proof, and the fact that [closing] arguments of counsel are not evidence." *Commonwealth* v. *Cohen*, 412 Mass. 375, 389 (1992). In these circumstances, no substantial likelihood of a miscarriage of justice arose.

For the same reasons, the rhetorical question did not shift the burden of proof to the defendant. The prosecutor was not challenging the defendant to prove that the victim had a knife. Rather, she was commenting on the lack of any evidence that indicated that the victim had a knife.

3. *Jury instructions.* We reject the defendant's contention that the judge erroneously refused, over his objection, to instruct the jury on voluntary manslaughter based on reasonable provocation. "Voluntary manslaughter is an unlawful killing 'arising not from malice, but "from . . . sudden [heat of] passion induced by reasonable provocation, sudden combat, or [the use of] excessive force in self-defense." ' " *Commonwealth* v. *Acevedo*, 446 Mass. 435, 443 (2006), quoting *Commonwealth* v. *Carrion*, 407 Mass. 263, 267 (1990). "A killing is manslaughter if there is 'provocation deemed adequate in law to cause the accused to lose his self-control in the heat of passion, and if the killing followed the provocation before sufficient time had elapsed for the accused's temper to cool.' " *Commonwealth* v. *Vinton*, 432 Mass. 180, 189 (2000), quoting *Commonwealth* v. *LeClair*, 429 Mass. 313, 316 (1999). "A manslaughter instruction based on reasonable provocation is not appropriate unless there is evidence that, when considered in the light most favorable to the defendant, is 'sufficient to create a reasonable doubt in the minds of a rational jury that a defendant's actions were both objectively

and subjectively reasonable. That is, the jury must be able to infer that a reasonable person would have become sufficiently provoked and would not have "cooled off" by the time of the homicide, and that in fact a defendant was provoked and did not cool off.' " *Commonwealth v. Benson,* 453 Mass. 90, 95 (2009), quoting *Commonwealth v. Zagrodny,* 443 Mass. 93, 106 (2004).

The defendant maintains that, even though he did not identify the victim as his attacker, there was evidence, in the form of the defendant's statements to police, that he had been attacked with a knife and had been seriously injured, that warranted the instruction. He also argues that the jury could have had a reasonable doubt regarding whether the Commonwealth disproved that he had been attacked.

Contrary to the defendant's suggestion, there must be evidence that the defendant was provoked by the victim. Because such evidence was lacking here, the defendant was not entitled to the instruction. See *Commonwealth v. Gonzalez,* 465 Mass. 672, 686 (2013), and cases cited ("no voluntary manslaughter based on reasonable provocation was warranted because there was no evidence of provocation by the victim"). See also *Commonwealth v. Rodriquez,* 461 Mass. 100, 108 (2011), quoting *Commonwealth v. Espada,* 450 Mass. 687, 696-697 (2008) ("for sudden combat to be the basis of a voluntary manslaughter instruction, the 'victim . . . must attack the defendant or at least strike a blow against the defendant' "). An attack of the defendant, by his account to police, on Cambridge Street by a Hispanic male about thirty years of age would not permit a jury to reasonably infer that the attacker was the victim where it was uncontested that the victim was an African-American male who was sixty-four years of age. Also, the presence of the defendant's DNA in the victim's apartment is not enough for the jury to have reasonably inferred that "an action of the victim trigger[ed] a *sudden* loss of self-control in the defendant." *Commonwealth v. Benson,* 453 Mass. at 95, citing *Commonwealth v. McLeod,* 394 Mass. 727, 738, cert. denied sub nom. *Aiello v. Massachusetts,* 474 U.S. 919 (1985). Further, the defendant's statements to police did not speak to the timing of the killing. "We consider only whether the incidents immediately preceding

the killing constituted reasonable provocation." *Commonwealth v. Amaral*, 389 Mass. 184, 188 (1983). The provocation claimed by the defendant was his attack on Cambridge Street. The victim was discovered in his apartment in Boston. There was no evidence that the victim provoked the defendant "immediately" before the victim was stabbed.

4. *Response to jury question.* During deliberations the jury sent the following note to the judge: "According to the law, does the possibility of defensive wounds on the perpetrator have any impact on returning a verdict of first versus second-degree murder?" The judge stated that she was inclined to answer the question by repeating the elements of murder in the first degree and murder in the second degree, and pointing out that the difference between the two was the element of extreme atrocity or cruelty. The prosecutor agreed and requested that the judge also include the instruction that the jury find the highest degree of murder that the facts allow. Defense counsel proposed that the judge answer the question, "Yes," or, "It may," and then refer the jury to the instructions that were provided. He objected to reinstructing the jury on the duty to return the highest degree of murder supported by the evidence.

The judge proceeded as she initially proposed. She first, however, told the jury that she could not answer the question directly because she could not "comment on the facts," which were for the jury to find. The judge then repeated her instructions on the elements of murder in the first degree based on extreme atrocity or cruelty and murder in the second degree, the full definition of extreme atrocity or cruelty, the Commonwealth's burden to prove all of the elements of the offense beyond a reasonable doubt, and the jury's duty to find the defendant guilty of the most serious offense that the Commonwealth had proved beyond a reasonable doubt. She concluded by instructing, "If the evidence does not prove beyond a reasonable doubt that the defendant is guilty of any offense charged, you must find him not guilty." Defense counsel repeated his objection.

The defendant argues that, in response to the question, the judge should have instructed that whether the possibility that the defendant's injury was defensive could have a bearing on the Commonwealth's proving that the defendant possessed the

requisite intent to kill or cause serious bodily injury. He also contends that, by repeating the instruction that the jurors were to return a verdict of the highest degree of murder that was proved, the judge "may have unfairly tipped the balance in favor of a conviction for [murder in the first degree]."

"The proper response to a jury question must remain within the discretion of the trial judge, who has observed the evidence and the jury firsthand and can tailor supplemental instructions accordingly." *Commonwealth* v. *Monteagudo*, 427 Mass. 484, 488 (1998), quoting *Commonwealth* v. *Waite*, 422 Mass. 792, 807 n.11 (1996). "To sustain an appellate claim that a judge committed an abuse of discretion, it must be demonstrated that 'no conscientious judge, acting intelligently, could honestly have taken the view expressed by [her].' " See *Commonwealth* v. *Goodreau*, 442 Mass. 341, 348 (2004), quoting *Commonwealth* v. *Ira I.*, 439 Mass. 805, 809 (2003). "[B]efore a judge responds to a jury communication of legal significance . . . , counsel should be given the opportunity to assist the judge in framing an appropriate response and to place on record any objection they might have to the course chosen by the judge." *Commonwealth* v. *Floyd P.*, 415 Mass. 826, 833 (1993). A judge is not required to reinstruct a jury. *Commonwealth* v. *Barros*, 425 Mass. 572, 577 (1997).

The judge did not abuse her discretion. She followed appropriate procedures by consulting with counsel. Although her answer did not directly respond to the jury's question, the judge correctly recognized that the question involved a factual question (the possibility of defensive injuries to the defendant) to which she was not authorized to speak. The judge's response provided the jury with the relevant legal framework, however, to resolve their question about a factual issue raised in the case. Further, the judge's response did not preclude the jury from concluding that the defendant's injury had an impact on his intent to kill.

There was no error in reinstructing the jury on their duty to find the defendant guilty of the most serious offense that the Commonwealth had proved beyond a reasonable doubt. See *Commonwealth* v. *Anderson*, 408 Mass. 803, 808 (1990), cert. denied, 513 U.S. 934 (1994), and cases cited (judge is "entitled

to inform the jury of [their] duty to return a verdict of guilty of the highest crime that was proved beyond a reasonable doubt"). The judge's instruction mirrored our instruction set forth in our Model Jury Instructions on Homicide 93-94 (2013), and included the instruction that, "[i]f the evidence does not prove beyond a reasonable doubt that the defendant is guilty of any offense charged, you must find him not guilty."

5. *Relief pursuant to G. L. c. 278, § 33E.* As is our duty, we have examined the record pursuant to G. L. c. 278, § 33E, and discern no basis on which to grant the defendant relief.

*Judgment affirmed.*